UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
UNITED STATES OF AMERICA,

                                                        **REPORT AND**
                                                        **RECOMMENDATION**
                        -against-                       16-CR-545 (ADS)(AYS)

TYRONE ROBINSON,
                                Defendant.
------------------------------------------------------------------X

**SHIELDS, Magistrate Judge:**

Defendant Tyrone Robinson ("Robinson" or the "Defendant") is charged in a thirty-two count superseding indictment arising from nine gunpoint robberies and attempted robberies. In a Memorandum of Decision and Order dated November 13, 2018 (the "November 13 Order") the District Court issued a decision as to several of Defendant's motions to suppress evidence, as well as his requests to reopen prior hearings and to dismiss certain charges. See Docket Entry ("DE") herein 158 at 4-5. In that decision, the District Court granted Robinson's motion for a limited suppression hearing. That hearing was directed to address factual circumstances regarding the March 26, 2016 seizure of evidence from a 2016 Black Chrysler Van with New Jersey license M23GCW (the "Rental Van") and evidence seized without a warrant from a cellphone with the number (718) 350-0346. As to the latter, the Government contended that the cell phone seized was found abandoned on a roof (the "Roof Cellphone"). In addition to assessing the validity of the search, a hearing with respect to the Roof Cellphone was also necessary to determine the underlying factual validity of a July 8, 2016 Federal warrant. That warrant, as discussed below, included a statement as to the location of the Roof Cellphone in support of its allegations of probable cause to search. See DE 158 at 1-2.

1

The suppression hearing granted in the November 13 Order was referred to this Court for Report and Recommendation. DE 158 at 44. Pursuant to that order, this Court held a suppression hearing on February 4, 6 and 7, 2019.  On February 18, 2019, the parties submitted their proposed findings and conclusions. For the reasons set forth below and based upon the facts developed at the suppression hearing, this Court respectfully recommends that the referred motions be denied.

BACKGROUND

I.      The November 18 Order and the Scope of the Referral

The hearing referred by the District Court required this Court to hear evidence and find facts related to seizures that were made on March 26, 2016, by members of the Suffolk County Police Department (the "SCPD"). Those seizures were made after SCPD personnel responded to a 911 call with respect to an alleged home invasion at 147 Smith Avenue, Lake Grove, New York ("147 Smith"). Below, this Court outlines the facts that were before the District Court with respect to the seizure of evidence in this matter, and discusses the scope of the referred hearing.

On March 26, 2016, SCPD seized and conducted a search of the Rental Van. A rental agreement for the vehicle and a cellphone were among the items seized. There is no question but that the cellphone seized from the Rental Van had a "631" area code (the "Van Cellphone"). A second cellphone, referred to above and herein as the Roof Cellphone, was also seized that night. That cellphone had a "718" area code. The Government contends that the Roof Cellphone was found after it was abandoned on the roof of 147 Smith. Defendant denies this contention.

Thereafter, on April 15, 2016, SCPD Detective Vincent Callahan obtained a search warrant for the Rental Van and the contents of the Van Cellphone.  DE 137-15. Two Federal search warrants were later issued, the first by this Court on July 8, 2016, (the "July 8, 2016

2

Federal Warrant"). The July 8, 2016 Federal Warrant was issued upon the affidavit of ATF Special Agent Liscinsky. Contained in that probable cause affidavit was, inter alia, the representation that the Roof Cellphone was found on the roof of 147 Smith. DE 131-10 at ¶12. That warrant authorized the search of Robinson's residence, the Roof Cellphone, and an email account.  DE 131-3; 131-4; 131-5.

The motion relevant to this Court's hearing seeks suppression of evidence seized from the Rental Van (pursuant to the warrantless search of March 26, 2016 and the April 15, 2016 warrant) as well as evidence seized from the Roof Cellphone. The arguments made and facts to be developed with respect to each of these issues are distinct, and are outlined below.

A.    Arguments Made and Facts to Be Developed as to the Rental Van

With respect to the items seized from the Rental Van, the November 13 Order decided certain legal matters, and left certain facts to be developed at the hearing. As to matters of law, the District Court discussed the legal implication of the facts that Robinson was neither a renter nor an "authorized" driver under the rental contract for the van, and that he was neither in nor near the vehicle when it was seized and searched. First, the District Court discussed whether Robinson's status as an "unauthorized" driver required a finding that he lacked a reasonable expectation of privacy so as to raise a Fourth Amendment challenge to the search. Discussing the recent holding of the United States Supreme Court in Byrd v. United States, 138 S. Ct. 1519 (2018), the District Court recognized that "privacy expectations in rental vehicles are not subject to easily articulated bright-lines rules."  DE 158 at 8. As noted, protected legitimate privacy expectations arise not from only from possession of the vehicle or the terms of a rental agreements, but from "lawful possession and control and the attendant right to exclude others." DE 158 at 9, quoting Byrd, 138 S. Ct at 1527. In light of Byrd, the District Court held that the

3

facts that Robinson was an unauthorized driver who was not in the vehicle at the time of the search did not, standing alone or together, necessarily deprive him of a constitutionally protected privacy interest in the contents of the Rental Van. Instead, the Court held that it was necessary to hold a hearing to determine the facts surrounding the search of that vehicle. In addition to determining the issue of whether Robinson had a protected privacy interest in the Rental Van, a hearing was also necessary to determine whether, assuming such interest, the search thereof violated the Fourth Amendment.

B.      Arguments Made and Facts to Be Developed as to the Roof Cellphone

As to the Roof Cellphone, the District Court noted Defendant's position that the Roof Cellphone was not abandoned by Robinson on the roof of 147 Smith.  Instead, Defendant argued in his motion that he left that cellphone inside the Rental Van. The location of the Roof Cellphone was critical both to the issue of Robinson's claimed privacy interest, and to the validity of the probable cause affidavit submitted in support of the July 8, 2016 Federal Warrant. Therefore, the District Court directed that a hearing was necessary to determine the location of the Roof Cellphone at the time of its recovery. Simply put, the question for the hearing as to this issue was whether the Roof Cellphone was actually left in the Rental Van, as contended by Defendant, or found by the SCPD on the roof of 147 Smith, as contended by the Government.

C.      Matters Beyond the Scope of the Hearing

During the course of the hearing before this Court, Defense counsel attempted to elicit testimony regarding the issue of probable cause to arrest Robinson. In particular, the defense sought to question witnesses regarding whether or not Robinson was under arrest when he was detained by SCPD approximately one mile away from 147 Smith. Defense counsel sought to undermine the veracity of the grounds for any detention. According to Defendant, such

4

testimony was relevant to the issue of probable cause to search the Rental Van, and to impeach the credibility of witnesses.

This Court held that the testimony sought to be elicited by Defendant was beyond the scope of the referred hearing. While limited testimony regarding Robinson's arrest was heard, such testimony was allowed only as relevant to the issue of whether Robinson abandoned the vehicle in which he claimed a privacy interest. This Court therefore allowed the Government to elicit testimony to support their position that Robinson was moving away from the Rental Van when he was apprehended approximately one mile away from 147 Smith. The Court also allowed introduction of DNA evidence indicating that Robinson was the person who fled from that address. As argued by the Government, such facts tend to establish that Robinson abandoned the Rental Van, and therefore lacked a Constitutionally protected privacy interest. Defendant took issue with this Court's rulings regarding the scope of permissible testimony, and argued that any claimed basis for Robinson's arrest was somehow connected to the issue of whether there was probable cause to search the Rental Van, and to the credibility of Government witnesses.

After hearing testimony regarding the timeline at issue, and reviewing closely the November 13 Order, this Court ruled that the testimony sought to be elicited by Defendant was beyond the scope of the referred hearing. This Court therefore denied Defendant the opportunity to question witnesses regarding probable cause and the circumstances surrounding Robinson's arrest.

In a letter dated February 9, 2019, Defendant sought the District Court's permission to re-open the hearing before this Court. Specifically, the defense sought to elicit testimony relating to Robinson's arrest, and the issue of whether that arrest was a pretext to detain Robinson during the investigation of the incident at 147 Smith. See DE 174. The Government opposed the request

to re-open the hearing to allow additional testimony. DE 174. In a decision dated February 19, 2019, the District Court denied the request to re-open the hearing.  DE 185.

With this factual and procedural background in mind, the Court turns to discuss the facts developed at the hearing, and its recommendations regarding the motions referred.

II.     Source of Facts Developed at the Hearing

The facts set forth below are drawn from documents before the District Court and this Court, as well as testimony and documents received at this Court's evidentiary hearing. The recitation of facts is in accord with both Rule 12(c) of the Federal Rule of Criminal Procedure, which requires that "essential findings" be stated on the record, and 28 U.S.C. §636(b)(1)(B), which requires that this Court submit proposed findings of fact to the District Court. See Fed. R. Crim. P. 12(c); 28 U.S.C. §636 (b)(1)(B).

III.    Testimony and Evidence Received at the Hearing

Six witnesses testified credibly at the hearing held before this Court. Those witnesses were SCPD Officer Eli Tretola ("Officer Tretola"), SCPD Officer David Vlacich "("Officer Vlacich"), SCPD Detective Vincent Callahan ("Detective Callahan"), SCPD Detective Arthur Rall ("Detective Rall"), and SCPD Emergency Services Unit Police Officer Carmine Pellegrino ("Officer Pellegrino") (collectively the "SCPD witnesses"). This Court also heard the credible testimony of civilian Ms. Khadijah Muhammed, the individual who rented the Rental Van.

Witness testimony at the hearing was aided and corroborated by SCPD radio transmissions which were also entered into evidence. With respect to those transmissions, Counsel agreed to the use of a transcript as an aid to the Court. That transcript is Government Exhibit ("GX") 1A. The radio transmissions were also explained in depth by the SCPD witnesses. Also entered into evidence were maps detailing the area surrounding 147 Smith.

These maps assisted the Court in visualizing the events of the night of March 26, 2016. They also assisted in determining the topography of the area, and distance between critical areas.

The Court also received into evidence photographs taken by SCPD on March 26, 2016. Those included photographs of the outside of 147 Smith, the empty second floor apartment that was cleared and searched by Officer Pellegrino, as well as photographs of the roof and adjacent areas. Also received in evidence were photographs of Robinson that were taken after his arrest. However, those photographs are not discussed herein as they were neither considered nor necessary to determine the facts essential to the matters before the Court. All of the documents entered into evidence and considered by the Court were received without objection.

IV.     Description of the Area Surrounding 147 Smith

Before outlining the facts preceding the search of the Rental Van and the Roof Cellphone, the Court describes below the area surrounding 147 Smith, as detailed in the maps presented at the hearing.

The area at issue can best be described as a somewhat irregular rectangle bordered by Smith Street along the south ("Smith"), Crotty Avenue along the east ("Crotty"), Terry Avenue along the north ("Terry") and Hawkins Avenue along the west ("Hawkins"). See GX R. The house at 147 Smith is located on Smith, just east of Hawkins. At the relevant time, a Subway restaurant ("Subway") was located on the corner of Smith and Hawkins. Along the eastern corner of the parking lot for Subway is a fence. That fence separates the Subway parking lot and the next closest house, which is 147 Smith. See GX S. If one were to proceed east along Smith from the front of 147 Smith, the next street reached is Crotty. GX R.  If one were to proceed northbound (turn left) on Crotty, the next intersection (which runs parallel to Smith) is Terry. GX R. Proceeding west along Terry, the next intersection is Hawkins. GX R. Completing this

7

rectangle, proceeding south along Hawkins, the next intersection reached is the corner of Hawkins and Smith, which is the location of the Subway.

It is important to note that the area within the rectangle that is behind 147 Smith toward Terry, is heavily wooded. At the relevant time, there was an abandoned house on Terry behind that wooded area. GX R (abandoned house marked at hearing with "X" in relation to 147 Smith (circled on map at hearing)); GX 1A at 4 (transmission time stamped 8:02:19 P.M. (describing area behind 147 Smith as "heavily wooded" with "an abandoned house as well")).

The final location described and relevant to the facts developed at the hearing is the place where Robinson was arrested – the corner of Hawkins and Washburn Avenue ("Washburn") – a location approximately one mile north of the intersection of Hawkins and Smith. See GX L. That site is approximately one mile north of both 147 Smith and the Subway location at the corner of Hawkins and Smith. Tr. 302; GX L.

With these locations in mind, the Court turns to discuss the events of the night of March 26, 2016.

<u>FINDINGS OF FACT</u>

The facts surrounding the search of the Rental Van and discovery of the Roof Cellphone took place during the relatively fast moving events between:

- a 911 call that took place at 7:45:21 P.M. advising of a disturbance and possible burglary at 147 Smith;

- Officer Tretola's response to that call at approximately 7:57, and his observation of a Black male jumping over a fence approximately one minute after his arrival;

- SCPD radio transmissions between approximately 8:03 and 8:18 P.M. regarding a witness statement made to police with respect to a black male in a van (with a particular license number) parked in front of an abandoned house on Crotty;

- Officer Vlacich's spotting and searching of the Rental Van, which was empty and open in a parking lot adjacent to 147 Smith at approximately 8:23 P.M.;

- Officer Pellegrino's search of the second floor apartment and roof of 147 Smith, and the clearing thereof by approximately 8:54 P.M.,

- The 10:50 P.M. impoundment and subsequent inventory search of the Rental Van by SCPD.

These events and the circumstances surrounding the rental of the van were described in detail by the SCPD witnesses, and the civilian witness who testified at the hearing as detailed below.

I.        Findings of Fact Regarding the Search of the Rental Van

A.        The 911 Call and Officers Tretola and Boudreau's Response

Officer Tretola testified credibly as to the following events. His testimony was corroborated by SCPD radio transmissions of that night.

On March 26, 2016, a 911 call regarding a possible disturbance at 147 Smith was received. Hearing Transcript ("Tr.") at 43. That call was received at 7:45:21, and lasted between five and six minutes. Id. Less than five minutes later, at 7:50:16 P.M., the radio dispatcher advised that there was a possible burglary in progress at 147 Smith. See GX 1A at 1. At the time, Officer Tretola, referred to as the "413" car on patrol, was alone in his car. He was then responsible for the 413 sector, which covered Lake Grove. The weather that night was clear and cool, in the upper 30's to lower 40 degree range. Tr. 46. Officer Tretola heard the call to 147

Smith, and responded at approximately 7:51 P.M. Tr. 47. He arrived at approximately 7:56 P.M. Tr. 51.

SCPD Officer Brian Boudreau, who was also on patrol at the time of the 911 call, responded to 147 Smith with Officer Tretola. The officers approached the house together. Tr. 53. As Officer Tretola testified, earlier radio transmissions alerted both he and Boudreau that a burglary invasion occurred at 147 Smith on the previous night, and that the invasion involved the use of a handgun. See GX 1A Transmissions time stamped 7:50:16 and 7:50:44, and 7:51:06 (advising of possible burglary in progress at 147 Smith); 7:55:01 (advising of handgun involvement). They therefore proceeded with caution.  Tr. 53-54.; 56.

Officer Tretola went to the back of the house to conduct a perimeter search before the officers could proceed inside. Tr. 56. It took him approximately one minute after his arrival to clear the area behind the house. Tr. 59. While there, Officer Tretola heard a rustling sound in the east front corner of the house, behind the front fence. He turned toward that sound and saw a Black male crouched against the fence. Tr. 59.  He yelled "Police. Let me see your hands."  Tr. 59. Just as he said those words, Officer Tretola observed the male jump over the fence to the east of the house.  Tr. 59.

Twenty-three seconds later, while on foot pursuit along with Officer Boudreau, Officer Tretola transmitted his description of the suspect as a "Black male, black and white hoodie" at 7:58:47 P.M. GX 1A at 2. Tr. 63-64. Tretola testified that he proceeded east on Smith to the next intersection which was Crotty. Tr. 69. In the meantime, the suspect was sought by both SCPD aviation and K-9 units. See Transmissions time stamped 7:58:24 (referring to K-9 response) and 7:58:37 (aviation response).

B.     Transmission of Witness Information Regarding a Black Male and a Van

At 8:03 P.M., Officer Tretola transmitted the result of an interview with witnesses on Crotty. See Tr. 107-08. That transmission referred to a witness who reported that "they" earlier saw a Black male in a black vehicle on Crotty. GX1A at 5. That description was refined in a transmission time stamped at 8:06:03. Id. In particular, that transmission stated that a witness at Terry and Crotty stated that "they saw a black male get into a minivan . . . ." Id. At the time of that transmission, one of the witnesses who saw the black vehicle was going inside to get a license plate number from inside a house.  Id. Approximately two minutes later, the witness returned and reported the license place as "M23GDW". See GX1A at 6. The dispatcher ran the plate (presumably as a New York license plate) and got no positive result.

A description of the male that the witness saw in the minivan parked on Crotty referred to that person as a "thin black male" with "I think" "a red baseball cap." GX1A at 7. The account of the witness was again transmitted over the SCPD police radio at 8:18:24 P.M. At that time, the witness was reported to have told the officer that the black vehicle was parked on Terry, in front of an abandoned house, which was behind 147 Smith. The witness further stated that the person in the van went "towards Hawkins" when he left the black vehicle. GX 1A at 8; Tr. 344.

C.     Officer Vlachich Encounters a Van in Subway Parking Lot

At 8:23:07 P.M., after the transmission of information regarding the man in a vehicle parked in front of the abandoned house on Crotty, and the witness information as to the license plate number, Officer Vlacich reported on the radio that he spotted a dark colored minivan in the Subway parking lot. Tr. 176. Importantly, Officer Vlacich's transmission regarding the van occurred after he heard the above-referenced transmissions regarding the possible burglary at 147 Smith, and the events of the night before which involved a home invasion and the use of a

11

handgun. Tr. 160. Given the time period and his knowledge of information transmitted over the SCPD radio, Officer Vlacich was also aware, at the time he encountered the van, of the witness information referred to above. Thus, he was aware of the description of a black van parked in front of an abandoned house, and the license plate number reported on that vehicle. Tr. 162-64. Officer Vlacich testified that he looked not only for vehicles with that exact plate number, but, in recognition of the fact that witnesses might mistake a letter or number, also those with similar numbers. Tr. 165.

It was after hearing all of these transmissions that Officer Vlacich reported seeing a black minivan parked in the corner of the Subway parking lot. At the time, he was "canvassing for a dark colored van" which he saw "parked in the Subway parking lot right next to the incident location." Tr. 178. As described above and at the hearing, that lot was adjacent to 147 Smith. Tr. 102. The license plate on the van reported by Officer Vlacich matched the license reported by the witness at Crotty almost exactly. GX1A at 8. While, as noted, the witness described the plate as a New York state plate bearing number M23GDW, the license plate of the vehicle spotted by Officer Vlacich was a New Jersey license plate, bearing the number M23GCW. Importantly, however, the plate number reported differed from that of the van in the Subway parking lot by only a single digit – a "C" instead of a "D." Tr. 181. Officer Vlacich reported that the van was unoccupied. GX1A at 9. The dispatcher ran the New Jersey license plate for the van, and determined that it was an Enterprise Rent-a-Car vehicle (hereinafter the "Rental Van"). GX1A at 10.

D.    Officer Vlacich's Search of the Rental Van

Upon seeing the Rental Van, Officer Vlacich exited his car and approached the vehicle. He pulled open the unlocked sliding door and looked inside. At the time, he knew of a Black

12

male fugitive and the description of the Rental Van. He also knew that the Rental Van was located nearby to 147 Smith. In light of these facts, he was understandably concerned that the suspect might be hiding in the vehicle. Tr. 269-70. Upon opening the unlocked doors, he saw that there was no one in the front, middle or rear seat of the vehicle. Tr. 182-83. While looking inside, Officer Vlacich noticed a piece of paper with perforated edges that looked like a rental agreement. In an effort to gain information about the suspect, he read that agreement. Tr. 184. The rental agreement was face down. Officer Vlacich turned it over to read it. The rental agreement was the only item that Officer Vlacich took out of the Rental Van at that time. Tr. 185.

In addition to looking inside the unlocked vehicle, Officer Vlacich also looked under the Rental Van to see if anyone was hiding underneath. Tr. 186-87.  It was during this inspection that he saw a set of keys placed on the top of the front driver's tire. Tr. 187.

E.    Subway Restaurant Video Surveillance of the Rental Van

Officer Vlacich continued his police work with respect to the Rental Van after his initial inspection described above. He proceeded into the Subway restaurant, and inquired as to whether there was video surveillance of the parking lot. The Government presented that video surveillance, which Officer Vlacich stated he viewed. The video footage presented at the hearing showed a dark van enter and park in the corner of the Subway parking lot. That location was consistent with Officer Vlacich's description of the location of the Rental Van.

The Court notes that the time stamp on the video indicates that the Rental Van entered the Subway parking lot at approximately 6:38 P.M. Officer Vlacich testified that the time of entry was actually one hour later. He explained that the reason for the 6:38 P.M. time stamp (as

13

opposed to 7:38 P.M.) was because the video cameras in the Subway restaurant were likely not properly "synched" to reflect Daylight Savings time. Tr. 202-03.

While no further evidence was submitted at trial regarding the time of sunset on March 26, 2016, the Government has elaborated on this argument in its submission. In particular, the Government states that because it is dark in the video clips viewed at the hearing, the time must have been 7:38 P.M. (after sunset) and not 6:38 P.M (prior to sunset). This is because, according to the Astronomical Applications Department of the U.S. Naval Observatory, sunset on March 26, 2016 in Lake Grove was at 7:15 P.M.  https://aa.usno.navy.mil/cgi-bin/aa_rstablew.pl?ID=AA&year=2016&task=0&state=NY&place=Lake+Grove.

The Court can, and does, takes judicial notice of the sunrise and sunset based upon the type of data submitted in the Government's response. See e.g., Cox v. City of New York, 2014 WL 3696003, * 1 (E.D.N.Y. July 23, 2014). Accordingly, and in light of the other facts presented, the Court accepts as fact that the Subway video footage viewed by Officer Vlacich recorded events of 7:38 P.M. and not 6:38 P.M. The Court finds, therefore, that the Rental Van entered the Subway parking lot just prior to the 7:45 P.M. time of the 911 call reporting a disturbance at 147 Smith. It further finds, as a matter of fact, that the vehicle was parked in the corner of that parking lot closest to 147 Smith.

While the Court agrees with the Government that the video also shows a man crossing the parking lot in the same area where the Rental Van was located, it notes that the video does not show anyone actually exiting the Rental Van. Additionally, Despite Officer Vlacich's testimony that the person crossing the parking lot was a black male, the video was not at all clear in terms of being able to discern whether the person crossing the parking lot was a man or a woman. Nor did the video depict clearly the person's race or what they were wearing. The only

14

item of clothing arguably depicted in the video were the sneakers worn by the person, which were reflective.

While facts concerning the identity of the individual crossing the parking lot are not crystal clear, it is clear that the Rental Van was never viewed or recorded to exit the Subway parking lot at any time after its 7:38 P.M. entrance, and Officer Vlacich's arrival at approximately 8:23 P.M. Nor, as discussed below, did anyone come to retrieve the unlocked vehicle prior to the SCPD decision to call for its impoundment. It is further important to note that while Officer Vlacich briefly left the Rental Van, that departure was only to view the video footage inside the restaurant, and he remained in a position to see that no one approached the vehicle while he was inside. Moving away from the vehicle under these circumstances was in accord with police procedure. Tr. 457.

F.    Officer Tretola Is Called to Washburn and Hawkins at 8:33 P.M.

While Officer Vlacich was investigating the vehicle at the Subway parking lot, Officer Tretola, after failing to see the suspect on Crotty, Tr. 69, returned on foot to his patrol car. He then proceeded to set up a post on the corner of Terry and Hawkins as part of a four corner perimeter set up by SCPD to catch the suspect who fled 147 Smith. Tr. 71. He was at that post at 8:33:46 P.M. – approximately ten minutes after Officer Vlachich spotted and searched the Rental Van parked in the Subway parking lot. At that time, Officer Tretola was asked to proceed to Washburn and Hawkins. He therefore asked that a patrol car be sent to cover his perimeter post. GX1A at 12; Tr. 78-79. When he arrived at Washburn and Hawkins, Officer Tretola was asked if he could identify the person detained as the person who fled 147 Smith. Tr. 79; 131-32. That suspect was Robinson. Tretola could not identify him. Tr. 130. He did testify, however, that the

suspect's pants were consistent with the sweatshirt worn by the individual who fled 147 Smith. Tr. 79.

G.  Detective Callahan's Involvement and the Impoundment of the Rental Van

Detective Callahan was also on duty on the night of March 26, 2016. He was advised of the 911 call, and proceeded to 147 Smith. He arrived there at approximately 8:45 P.M. Tr. 345. It was his role to "investigate the crime and process the crime scene". Tr. 348. Facts regarding his involvement in retrieval of the Roof Cellphone are discussed below. The Court discusses here his interaction with Officer Vlacich with respect to the Rental Van, and the decision to call for impounding of that vehicle.

At approximately 10:10 - 10:15 P.M., after Detective Callahan had secured and was preparing to leave 147 Smith, he was approached by SCPD Sergeant Scott who asked him "what about the van."  Tr. 373. Detective Callahan testified that he had no knowledge, at the time, that Officer Vlacich found a van believed to be connected to the incident at 147 Smith. He therefore responded to Sergeant Scott, "what van"? Tr. 373-74. While Detective Callahan's access to the earlier radio transmissions was addressed on cross-examination, he referred to such transmissions as "background," Tr. 406, and stated that he could not remember hearing those transmissions on the night of March 26, 2016. Tr. 408.

In any event, upon being informed that Officer Vlacich found a van that was believed to have been used in the incident he was investigating, Callahan drove to the Subway which he described as "right next door". Tr. 374-75. At the time of his arrival, Officer Vlacich told Detective Callahan that during the time that he was watching the Rental Van it remained in the same spot and was not approached.  Tr. 376; 419. Detective Callahan then decided to call for a truck to impound the Rental Van. Tr. 376. Prior to arrival of the truck, and as part of his

16

investigation and procedure, Detective Callahan took a series of photographs of the inside of the Rental Van. Among those was a photograph of the rental agreement for the vehicle, as well as a photograph of only a single cellphone left on the front seat of the Rental Van. Tr. 380; 416; GX 700 at 40. Photographs introduced at the hearing also show the seat of the Rental Van without the cellphone. Tr. 418. Although he photographed the lease agreement, Detective Callahan did not read that agreement, and was unaware of the gender of the renter. Tr. 411-12.

The Court accepts as fact that at the time of the call for impoundment, the Rental Van had remained in the same spot, unapproached by anyone since its 7:38 P.M. entry to the Subway parking lot (over three hours earlier). Tr. 377. Moreover, nearly two hours had passed since the Rental Van had initially been spotted and was under surveillance by Officer Vlacich.

Detective Callahan gave three reasons for his decision to impound the Rental Van. Those reasons were: (1) to verify ownership; (2) to ensure public safety and (3) because he thought the Rental Van might have been used in connection with the incident at 147 Smith. Tr. 376-77. As to verification, although Detective Callahan was aware that the Rental Van was owned by Enterprise Rental, he nonetheless was not in a position to simply call the company to come and pick up their vehicle. Instead, he explained that ownership would have to be verified by showing proof of ownership of title. Tr. 458. As to public safety, Detective Callahan noted that it would be unsafe to leave an open vehicle (that had already remained un-retrieved for several hours) unlocked in a public parking lot where it could be taken by anyone. Tr. 431. He also believed that the Rental Van might have been involved in a crime at 147 Smith. Tr. 378-79; 431. Detective Callahan left the Subway parking lot at 10:50 P.M., after the securing the items he located in an evidence bag. Tr. 380-81.

17

H.    Testimony of Civilian Khadijah Muhammed as to the Rental Van

The Government presented the testimony of civilian witness Khadijah Muhammed ("Ms. Muhammed") who testified pursuant to subpoena. Ms. Muhammed's name appears on the rental agreement that was retrieved from the Rental Van by Officer Vlacich. GX H. As demonstrated on that document and through Muhammed's testimony, it was she who rented the vehicle from Enterprise Rental in Deer Park New York. See GX H; Tr. 146. After driving the Rental Van off the Enterprise lot, Ms. Muhammed gave the keys and the vehicle to Robinson. Tr. 147-48. When asked to explain the reason she allowed Robinson to drive away with a van rented in her name, Ms. Muhammed testified that she was friends with Robinson, describing their relationship as intimate. Tr.144-47. She also stated that she had rented vehicles for Robinson in the past, Tr. 147, and that she gave her permission to Robinson to drive the Rental Van. Tr. 153-54. There was also evidence that Ms. Muhammed knew that Robinson owned a vehicle that might have been in the car shop for repair. Tr. 152-53.

Ms. Muhammed agreed that she rented the vehicle to trick Enterprise. Tr. 148. While she testified that she did not know whether Robinson had a valid driver's license, the Government introduced documentary evidence that Robinson did not have a license. Tr. 156; GX N. Additionally, when first approached by detectives asking about the rental, Ms. Muhammed lied because she was trying to protect Robinson. Tr. 150. However, other than the possible crime of driving without a license, no evidence was presented showing that Ms. Muhammed knew that the Rental Van might or would be used in the commission of a crime.

I.    Testimony Regarding Items Found by SCPD at 147 Smith and DNA Evidence

In addition to the testimony referred to above, the Government presented testimony and documentary evidence regarding evidence found at 147 Smith, and the results of DNA testing

18

with respect to that evidence. This evidence was not produced in support of any argument advanced with respect to probable cause to search 147 Smith, the roof thereof, or the Rental Van. Instead, that evidence was presented only in support of the argument that on the night of March 26, 2016, Robinson intended to put as much distance as possible between himself and the Rental Van. This scenario was offered in support of the Government's proposed conclusion that Robinson intentionally abandoned the Rental Van, thereby forfeiting any opportunity to claim a privacy interest with respect thereto.

The first such item of evidence and testimony related thereto was a baseball cap with a red bill. GX 700 at 34-36; GX 702 at 3. That cap was found by Officer Tretola when he returned to 147 Smith, after failing to make a positive identification of Robinson as the person who fled from that house.  Tr. 72-74. The cap was recovered by Detective Callahan on the ground next to the east side of the fence where the suspect jumped and fled. Tr. 365-67; see GX 700 at 34-36. Subsequent DNA testing of the cap revealed that it contained Robinson's DNA. GX 5. The Government also presented testimony indicating that Officer Pellegrino found a wallet on the ground next to the fence jumped by the fleeing suspect.  Tr. 468; GX 700 at 27. The wallet was recovered from the scene by Detective Callahan. Tr. 468. While there was no DNA evidence presented linking the wallet to Robinson, it was offered in support of the theory that the suspect (who is argued by the Government to be Robinson) carelessly and speedily fled the scene, dropping his hat and his wallet.

The Government also relies on the fact that the Roof Cellphone was found on the roof in support of the theory that Robinson was the person who fled from 147 Smith, and that he therefore showed no intention of returning to the Rental Van. While a test of the Roof Cellphone did not reveal the presence of Robinson's DNA, Robinson does claim that phone as his own. The

19

location of that phone on the roof is also argued to support the conclusion that Robinson fled 147 Smith, and did not thereafter make any attempt to return to the house (which was adjacent to the place where the Rental Van was parked) at any time, either prior or after it was found by Officer Pellegrino.

II.    Findings of Fact Regarding the Location of the Roof Cellphone

Testimony relevant to the location of the Roof Cellphone was elicited at the hearing from Officer Tretola, Officer Pellegrino and Detective Callahan as described below.

As described above, Officer Tretola transmitted the escape of the suspect at 7:58:22 P.M. (approximately two minutes after his arrival at 147 Smith). With respect to testimony relevant to the location of the Roof Cellphone, Officer Tretola testified his belief that the suspect jumped from the roof of 147 Smith to the place where he was observed crouched at the side of the house. However, he did not see how the suspect got to that location. Thus, he neither saw anyone jump from the roof, Tr. 89, nor anyone exit from any door at 137 Smith. Tr. 135. Additionally, he heard no activity on either the upper or lower roof of the house when he was securing the area. Tr. 84.

Instead of direct observation, Officer Tretola's testimony that the suspect jumped from the roof was based upon the facts and circumstances presented, and his experience as a police officer. Tr. 61. In particular, he testified that his testimony was based on the fact that he had cleared the entire back of the house prior to encountering the suspect in the fenced in corner of the house. According to Officer Tretola, and there was no way that a person could have reached that location without jumping from the roof.  Tr. 136.

Important testimony regarding the location of the Roof Cellphone was elicited at the hearing from Officer Pellegrino and Detective Callahan. Officer Pellegrino was in his patrol car

at approximately 8:37 P.M. when he was called to 147 Smith in his role as part of the Emergency Services Unit. Tr. 472; 474. He and his partner were the first officers to enter the second floor apartment at 147 Smith, which was locked when they arrived. Tr. 463; 474. Officer Pellegrino and his partner entered and "cleared" the apartment, making sure that no one was hiding inside. Tr. 464. Upon entering the apartment, Officer Pellegrino noticed an open window. See GX 700 at 12-13. He looked out of that window onto a roof landing. It was there that he saw the Roof Cellphone. Tr. 464-65; see GX 700 at 12-13. After clearing the apartment by approximately 8:54 P.M., Tr. 473, Officer Pellegrino told Detective Callahan that he saw a cellphone on the roof. Tr. 466. He imparted this information to Detective Callahan in person, and not via a radio transmission.  Tr. 477. He thereafter assisted Detective Callahan in recovering the phone by retrieving a ladder from his truck.  Tr. 466-67.

As noted, it was Detective Callahan's role on the night of March 26, 2016 to "investigate the crime and process the crime scene". Tr. 348. In accord with Officer Pellegrino's testimony, Detective Callahan testified that upon his arrival, Officer Pellegrino told him that he found a cell phone on the roof of 147 Smith. Tr. 349. That phone, the Roof Cellphone, was stated to have been visible through the open window of the second floor apartment. Tr. 350. Detective Callahan entered that apartment after Officer Pellegrino had been through it. Tr. 354.

Detective Callahan took several photographs of 147 Smith that were presented at the hearing. Among those were a series of photographs depicting the outside of 147 Smith, the inside of the second floor apartment, and the roof where the Roof Cellphone was stated to have been found. Tr. 356. See generally GX 700. The photographs submitted at the hearing showed an open window in the second floor apartment. Photographs of the roof area outside of that window show a red cellphone on that area of the roof. GX 700 at 21-25.

21

Having outlined all of the testimony presented at the hearing, the Court proceeds to make its recommendations regarding the motions to suppress.

ANALYSIS

I.    <u>Legal Principles</u>

A.    <u>The Government's Burden and Issues Considered</u>

Where, as here, a Defendant claims the unconstitutionality of a seizure, the Government bears the burden of justifying the search.  <u>See</u> <u>United States v. Herron</u>, 18 F. Supp. 3d 214, 221 (E.D.N.Y. 2014). All of Defendant's claims here involve application of the Fourth Amendment to the United States Constitution and whether the properties at issue (the Rental Van and/or the Roof Cellphone) were abandoned so as to defeat the ability to show an interest protected by the Fourth Amendment. Also discussed is the issue as to whether there was probable cause to search the Rental Van.

With respect to the Roof Cellphone, the Court discusses only the abandonment issue. That is because no real issue was raised as to whether a search of the roof was made without probable cause. Thus, the only issue discussed and decided with respect to the Roof Cellphone is the location where it was actually found, and whether it should be deemed to have been abandoned.

With respect to the search and seizure of the Rental Van, this Court was tasked with determining facts to decide: (1) whether Robinson had a sufficient expectation of privacy to challenge any search under the Fourth Amendment and (2) assuming such interest, whether the Fourth Amendment was violated. The Court here approaches these two questions in this order, and the term "standing" has been used in these proceedings. It is important to note, however, that the "privacy interest" question is not a threshold jurisdictional matter that must be decided in

order to confer "standing" under the Fourth Amendment. Indeed, the question of whether a

defendant has a privacy interest "need not be addressed before addressing other aspect of the

merits of a Fourth Amendment claim." Byrd, 138 S. Ct. 1518, 1530 (2018). Accordingly, while

this Court discusses whether a privacy interest exists prior to its discussion of probable cause,

that order of consideration is not required. Instead, the order in which these questions are

addressed, and, indeed whether the District Court chooses to address only the question of the

Constitutionality of the searches at issue, is within the discretion of that Court. See Byrd, 138 S.

Ct. at 1530-31.

   B.    The Effect of Abandonment on a Fourth Amendment Claim of Privacy

   The Fourth Amendment establishes a constitutional right to protection against

"unreasonable searches and seizures." U.S. Const. amend. IV. An expectation of privacy

sufficient to invoke the protection of the Fourth Amendment arises from the "lawful possession

and control" of property and the accompanying right to exclude others.  Gem Financial Servs.,

Inc. v. City of New York, 298 F. 3d 464, 480 (E.D.N.Y. 2018). When claiming the protection of

the Fourth Amendment, a person must show "both that he had an expectation of privacy that

society is prepared to recognize as reasonable, and that he acted in such a way to indicate a

subjective expectation of privacy." United States v. Quashie, 162 F. Supp. 3d 135, 141

(E.D.N.Y. 2016).

   The protections of the Fourth Amendment do not extend to abandoned property, as to

which there can be no expectation of privacy. Indeed, it is well settled that "seizure of abandoned

property does not violate the Fourth Amendment." United States v. Springer, 946 F.2d 1012,

1017 (2d Cir.1991); see United States v. Lee, 916 F.2d 814, 818 (2d Cir.1990) ("When a person

voluntarily abandons property, ... he forfeits any reasonable expectation of privacy that he might

23

have had in the property."); United States v. Miller, 382 F. Supp.2d 350, 381 (N.D.N.Y. 2005) (noting that Second Circuit has "consistently held that the search of abandoned property violates no privacy interest").

The issue of whether property has been abandoned focuses on the intent of the person who is said to have abandoned the property. Quashie, 162 F. Supp.3d at 141. Nonetheless, abandonment is a question of fact that must be decided "in objective terms on the basis of all the relevant facts and circumstances." United States v. Levasseur, 816 F.2d 37, 44 (2d Cir. 1987). "The facts and circumstances pertinent to the court's abandonment inquiry are not limited to those which were known to the officers at the time of the search or seizure." Levasseur, 816 F.2d at 44. Instead, the issue is whether the individual claiming a privacy interest manifested an intent to abandon the property at issue, "thereby forfeiting his expectation of privacy." Id. Moreover, events discovered after a search "may support an inference that [the defendant] had already chosen, and manifested [his] decision, not to return to the property." Levasseur, 816 F.2d at 44.

Clear cases of abandonment include those where a suspect throws contraband away, e.g., Taylor v. Connelly, 18 F. Supp. 3d 242, 255 (E.D.N.Y. 2014), or where a person expressly denies ownership in the property seized or searched. See, e.g. United States v. Viserto, 2010 WL 3449219, *2 (2d Cir. September 3, 2010); United States v. Torres, 949 F.2d at 608. Less clear are cases where the intent of the person claiming a protected property interest is not so expressly communicated. Such cases may include property interests in a rented vehicle. As noted by the District Court, the mere absence of a person from a vehicle, or failure to include his name on a rental agreement does not necessarily defeat a finding of a privacy interest protected by the Fourth Amendment. DE 158 at 8.

However, leaving an item in a public place is strong evidence of abandonment. <u>California v. Greenwood</u>, 486 U.S.35, 40 (1988). Additionally, as stated by the Second Circuit, "[n]either possession nor ownership of property establishes a legitimate expectation of privacy unless the party vigilantly protects the right to exclude others." <u>Torres</u>, 949 F.2d at 608; <u>United States v. Davis</u>, 2008 WL 4615897, * 4 (S.D.N.Y. October 14, 2008).

C.      <u>Probable Cause Sufficient to Conduct a Warrantless Search</u>

As explained by the Supreme Court, "probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts." <u>Illinois v. Gates</u>, 462 U.S. 213, 232 (1983). Probable cause to search exists when the facts and circumstances within the officers' knowledge "and of which they had reasonably trustworthy information" are enough to warrant a reasonable belief that "evidence of a crime will be found in the place to be searched." <u>United States v. Gaskin</u>, 364 F.3d 438, 456 (2d Cir. 2004), citing, <u>Brinegar v. United States</u>, 338 U.S. 160, 175. Probable cause is not a concept that demands certainty, but only a "fair probability" that contraband or evidence of a crime will be found. <u>Gates</u>, 462 U.S. at 238. "Further, courts recognize that experience and training may allow a law enforcement officer to discern probable cause from facts and circumstances where a layman might not". <u>Gaskin</u>, 364 F.3d at 456 (2d Cir. 2004), citing <u>United States v. Price</u>, 599 F.2d 494, 501 (2d Cir.1979).

D.      Relevant Exceptions to Warrant Requirement:
         <u>The Automobile, Public Safety, and Inevitable Discovery Doctrines</u>

Under the "automobile" exception to the Fourth Amendment, law enforcement officers may conduct a warrantless search of a "readily mobile motor vehicle if probable cause exists to believe the vehicle contains contraband or other evidence of a crime." <u>Gaskin</u>, 364 F.3d at 456; <u>United States v. White</u>, 298 F. Supp3d. 451, 456 (E.D.N.Y. 2018). The fact that a car is secured

in a parking lot does not render the automobile exception inapplicable. Accordingly justification of a search does not depend upon whether a person was in a vehicle, ready to drive away. See United States v. Mundy, 806 F. Supp. 373, 376 (E.D.N.Y. 1992). Instead, the issue is whether probable cause existed at the time of the search to believe in the presence of contraband, or evidence of a crime.

In addition to the automobile exception, also relevant here are arguments related to the impoundment and subsequent inventory search of the Rental Van. Specifically, the Government argues that the Rental Van was properly impounded for three reasons, including to ensure public safety. With respect to the claimed public safety reason, the Court notes that the police are authorized to search an unsecured vehicle. Such search and seizure is authorized as part of the police "community caretaking function." Mundy, 806 F. Supp. at 376-77. That function authorizes the removal of a vehicle that presents a threat to public safety if it is left as discovered. See White, 298 F. Supp.3d at 461.

Given its allegations of proper impoundment, the Government argues that evidence seized from the Rental would have been inevitably discovered as part of the routine SCPD inventory search. Where, as here the Government claims inevitable discovery on the basis of inventory search procedures, it must prove: "(1) that the police had legitimate custody of the vehicle or other property being searched, so that an inventory search would have been justified," "(2) that when the police in the police agency in question conducted inventory searches, they did so pursuant to established or standardized procedures," and "(3) that those inventory procedures would have inevitably led to the discovery of the challenged evidence." White, 298 F. Supp. 3d at 457; see Nix v. Williams, 467 U.S. 431, 447 ("Under the 'inevitable discovery' doctrine, evidence obtained during the course of an unreasonable search and seizure should not be

26

excluded 'if the government can prove that the evidence would have been obtained inevitably' without the constitutional violation.").

II.    <u>Disposition of the Motions</u>

    A.    <u>The Motions with Respect to the Roof Cellphone Should be Denied</u>

As summarized above, the District Court directed that a hearing be held to determine the veracity of the Government's position that Roof Cellphone was, indeed, found on the roof of 147 Smith, or whether it was, as Defendant argued "planted" there by police. This factual issue was necessary to determine Defendant's motion to suppress. Relatedly, this factual issue also led the District Court to conclude that Defendant might be entitled to relief under <u>Franks v. Delaware</u>, 438 U.S. 154 (1978) with respect to the July 2018 Federal Warrant. Importantly, a <u>Franks</u> hearing was ordered only with respect to the location of the Roof Cellphone – a factual declaration critical to the issue of probable cause supporting the July 2018 Federal Warrant. <u>See</u> DE 158 at 27.

    1.    Robinson Abandoned the Roof Cellphone and
           <u>Therefore Lacks a Cognizable Fourth Amendment</u>

At the hearing, with the exception of eliciting the fact that Officer Tretola did not actually see a person jump from the roof, Defendant presented no testimony tending to indicate that Government witnesses lied about the location where the Roof Cellphone was found. Nor did any testimony indicate that the Roof Cellphone was actually found in the Rental Van. Indeed, other than stating that the Government witnesses lied, Defendant's post-hearing submission offers no real argument in support of the theory that the Roof Cellphone was somehow planted on the roof of 147 Smith.

Based upon a review of the entirety of the testimony and photographs at the hearing, this Court finds that the Government witnesses testified credibly, and that the Roof Cellphone was indeed found on the roof of 147 Smith at the time of Officer Pellegrino's initial search. Under these circumstances there is no question but that the Roof Cellphone was abandoned. It was thereafter retrieved by Officer Pellegrino, and given to Detective Callahan when he was gathering the evidence at the scene. The abandonment of the Roof Cellphone deprives Robinson of a privacy interest therein. He may not therefore make any Constitutional argument with respect to the search thereof.

      2.     The *Franks* Issue

The finding that the Roof Cellphone was indeed found on the roof of 147 Smith also disposes of any issue with respect to the veracity of the information contained in the July 8, 2016 Federal Warrant under <u>Franks v. Delaware</u>, 438 U.S. 154,98 S. Ct. 2674 (1978). As noted, the probable cause affidavit in support of that warrant contained, <u>inter</u> <u>alia</u>, the representation that the Roof Cellphone was found on the roof of 147 Smith. DE 131-10 at ¶12. This Court's factual finding as to the location of that phone establishes the veracity of the facts contained in the affidavit, and defeats any claim that such statement was false. The referred <u>Franks</u> motion should therefore be denied.

      B.     <u>The Motion to Suppress with Respect to the Rental Van Should be Denied</u>

      1.     Robinson Abandoned the Rental Van and
                 <u>Therefore Lacks a Cognizable Fourth Amendment Interest</u>

The Court holds that the totality of facts developed at the hearing establish that Robinson abandoned the Rental Van, and therefore lacked a privacy interest that would allow him to complain of an unconstitutional search.

In addition to the legal principles set forth above, and in accord with the District's Court's referral, this Court is cognizant of the law that "privacy expectations in rental vehicles are not subject to easily articulated bright line rules." DE 158 at 8. This was recognized recently by the Supreme Court in <u>Byrd v. United States</u>, 138 S. Ct. 1518 (2018). There, the Supreme Court reversed the broad holding that an unauthorized driver of a rental car always lacks a privacy interest in the car sufficient to invoke the protections of the Fourth Amendment. The Court in <u>Byrd</u> left for remand the issues of whether "one who intentionally uses a third party to procure a rental car by a fraudulent scheme for the purpose of committing a crime is no better situated than a car thief" and whether the search at issue was justified by probable cause in any event. <u>Byrd</u>, 138 S. Ct. at 1531.

The facts in <u>Byrd</u> are similar to those here in certain respects. In both cases, the individual who rented the car did not disclose that another would be driving the car. Also, in both cases the driver was handed the keys to the rental vehicle by the driver, who left the rental agency in her own car. <u>See Byrd</u> 138 S. Ct. 1525. The cases differ, however, in certain respects. While Ms. Muhammed gave her permission for Robinson to drive the Rental Van, she also agreed that she rented the vehicle in order to "trick" Enterprise. Tr. 147-48. There is also evidence that she may have known that Robinson lacked a driver's license, and therefore was ineligible to drive the Rental Van – with or without her "permission." On the other hand, there was no evidence presented at the hearing that Ms. Muhammed had any knowledge that the Rental Van might be used in a crime.

While the facts with respect to the initial rental of the Rental Van might lead to the conclusion that Robinson had a protected privacy interest in that vehicle, critical facts distinguish this case from <u>Byrd</u> and lead to the opposite conclusion. Importantly, the individual claiming a

privacy interest in Byrd was driving, and therefore in possession of the rental car when questioned by police. In contrast, Robinson was nowhere near the Rental Van. Instead, he left it open and unattended in a public area for several hours. In such cases the law to be applied is clear. "A defendant has abandoned his reasonable expectation of privacy when he leaves an item in a public place." California v. Greenwood, 486 U.S. 35, 40 (1988). Leaving the Rental Van unlocked in a public place with the key on top of the front tire is strong evidence of abandonment. This evidence is strengthened by the fact that the Rental Van was not retrieved, or even approached by Robinson during the over three hour period it was left in the Subway parking lot. This period of time extended late into the night, after the restaurant was closed. Such facts, standing alone, are strong evidence of abandonment. Accord United States v. Barlow, 17 F.3d 85, 88 (5th Cir. 1994) (finding abandonment of a vehicle that was left unlocked, with the key in the ignition and on a public road).

Facts that developed after the search of the Rental Van further support the conclusion that the Rental Van was abandoned. As noted, such facts are properly considered when deciding the issue of abandonment. See Levasseur, 816 F.2d at 44. Those facts include Robinson's location at the time of his arrest, and those indicating that he was the person who fled 147 Smith – instead of walking toward the Rental Van at any time on the night of March 26, 2016. Again, these facts are not offered, and were not considered to determine any issue of probable cause to arrest Robinson. Instead, they were properly offered to show that Robinson lacked the intent to return to the Rental Van. Thus, Robinson was apprehended approximately a mile away from the Rental Van, and moving away therefrom. The DNA evidence recovered from the hat indicates that he was the person running away from 147 Smith which, as noted, was next door to the place where the Rental Van remained late into the night.

This Court has held that the Roof Cellphone was, indeed, retrieved on the roof of 147 Smith by Officer Pellegrino on the night of March 26, 2016. Robinson has consistently taken the position that the Roof Cellphone was his. The fact that this phone was haphazardly dropped on the roof is another fact to support a finding that Robinson did all he could to run away from the location where the Rental Van was parked, and had no intention of returning thereto.

For the foregoing reasons, this Court finds that Robinson abandoned the Rental Van and therefore lacks a cognizable privacy interest protected by the Fourth Amendment. He therefore cannot challenge the search and seizure of the Rental Van.

      2.      <u>Even Assuming a Protected Interest The Motion to Suppress Should be Denied</u>

Even assuming that Robinson had a constitutionally protected Fourth Amendment right, the warrantless search of the Rental Van did not violate the Constitution. As discussed below, the search of the Rental Van passes Constitutional muster for several reasons.

      a.      <u>There Was Probable Cause to Search the Rental Van</u>

First, there is no question that Officer Vlacich properly opened the doors of the Rental Van, and looked inside to determine whether the person responsible for the alleged invasion of 147 Smith was in the vehicle. It was reasonable for Officer Vlacich to believe that the perpetrator of a violent crime might be hiding in the Rental Van. It was also reasonable for Officer Vlacich to believe that the Rental Van contained evidence related to the attempted burglary of 147 Smith.

At the time of his search Officer Vlacich was in possession of facts that made his search valid pursuant to the automobile exception. As discussed above, that exception allows for a warrantless search of a "readily mobile motor vehicle if probable cause exists to believe the vehicle contains contraband or other evidence of a crime." <u>United States v. Gaskin</u>, 364 F.3d 438, 456 (2d Cir. 2004); <u>United States v. White</u>, 298 F. Supp. 3d. 451, 456 (E.D.N.Y. 2018). The

radio transmissions admitted at the hearing and Officer Vlacich's credible testimony conclusively established probable cause to search the vehicle. Additionally, such evidence credibly established probable cause for Detective Callahan to search the Rental Van. Importantly, at the time of their searches, both Officer Tretola and Detective Callahan knew of a possible burglary at 147 Smith - the property next door to the Subway parking lot. They knew that the burglary might involve the use of a handgun. They also had knowledge of witness testimony regarding a black van that was parked earlier in the evening in front of a nearby abandoned house. Additionally, they knew that the license plate numbers of the Rental Van matched the witness description of the suspicious vehicle almost exactly. These facts more than establish probable cause for both Officer Vlacich and Detective Callahan to have searched the Rental Van for evidence of the earlier crime at 147 Smith. See United States v. Colon, 250 F.3d 130, 135 (2d Cir. 2001); United States v. Feliz, 657 F. Supp. 2d 364, 372 (E.D.N.Y. 2009) (imputing knowledge of all facts supporting probable cause to all officers working on the same case).

> b.    The Rental Van Was Properly Impounded and Subject to an Inventory Search Thereby Triggering the Inevitably Discovery Doctrine

There is no question but that the evidence sought to be suppressed would have been discovered pursuant to what this Court finds was an appropriate impoundment and inventory search of the Rental Van. In particular, this Court finds that it was unquestionably reasonable for Detective Callahan to have ordered that the Rental Van be impounded. When Detective Callahan arrived at the parking lot where the Rental Van was located he knew all of the information referred to above. He also knew that the Rental Van was left open and unattended for over three hours. The keys to the Rental Van were left on the front tire – outside of the vehicle. Moreover,

when Detective Callahan ordered the impoundment of the Rental Van, it had been sitting in the corner of the lot closest to 147 Smith, even after the Subway restaurant had closed.

This Court finds as a matter of fact that the evidence presented at the hearing established conclusively that the impoundment was justified by the threat to public safety posed by leaving the unlocked and unclaimed vehicle with available keys in a public parking lot. This was a proper exercise of law enforcement's "caretaking" function, as described above and in United States v. Mundy, 806 F. Supp. 373 (E.D.N.Y. 1992). Public safety was certainly reason enough to impound the Rental Van. The second reason for impoundment, verification of ownership was also an independent and sufficient reason to take the vehicle into police custody. This was amply explained by Detective Callahan's testimony regarding the necessity to produce title of ownership before turning over a vehicle.

It matters not that in addition to their concerns for public safety and proof of ownership SCPD officers also thought that the Rental Van may have been used as part of a crime. While Defense counsel attempted to make much of the fact that one reason for ordering impoundment was suspicion that the Rental Van was used in a crime, that reason does nothing to change the propriety of the impoundment. Instead, it was just one of the three proper reasons offered for impoundment. Detective Callahan admitted as much, but also testified credibly that the vehicle was properly impounded for the public safety and title of ownership reasons set forth above.

Once impounded, the Rental Vehicle was subject to search as part of the procedure described by Detective Callahan. There was no testimony presented at the hearing that in any way impeached, in the Court's view, Detective Callahan's explanation as to the reasons for impoundment and procedure following that impoundment. The routine inventory search that followed impoundment would have led to the inevitable discovery of the evidence sought to be

suppressed. Accordingly, application of the inevitable discovery doctrine also mandates denial of the motion to suppress.

<u>SUMMARY OF RECOMMENDATIONS</u>

In summary, and in light of the Court's assessment of the documents presented at the hearing and the credibility of the witnesses, the Court makes the following ultimate factual findings and recommendations:

- The Roof Cellphone was abandoned on the roof of 147 Smith on March 26, 2016.

- Robinson lacks a protected privacy interest sufficient to object to any search of the Roof Cellphone.

- The July 2018 Federal Warrant contained truthful statements as to the location of the Roof Cellphone.

- Robinson cannot challenge the July 2018 Federal Warrant under <u>Franks v. Delaware,</u> 438 U.S. 154 (1978).

- The Rental Van was abandoned by Robinson in the Subway Parking Lot.

- Robinson lacks a protected privacy interest sufficient to object to any search of the Rental Van.

- The searches of the Rental Van by both Officer Vlacich and Detective Callahan were supported by probable cause to believe that the Rental Van contained evidence of the crime earlier reported at 147 Smith and such searches were valid under the Fourth Amendment.

- The Rental Van was properly impounded.

- The impoundment of the Rental Van led to a proper inventory search.

34

- The inventory search of the contents of the Rental Van after the impoundment would have led to the inevitable discovery of evidence uncovered in the earlier search of that vehicle.

## CONCLUSION

For the foregoing reasons, it is respectfully recommended that Defendant's motions to suppress be denied.

## OBJECTIONS

A copy of this Report and Recommendation is being sent to all parties by electronic filing.  Any objections to this Report and Recommendation must be filed with the Clerk of the Court within 14 days. Failure to file objections within the specified time waives the right to appeal both before the district and appellate courts.  See 28 U.S.C. §636(b)(1); Fed. R. Crim. P. 59; United States v. Ballares, 317 App.'x 36, 37-38 (2d Cir. 2008).


Dated: Central Islip, New York
        February 27, 2019

                                            /s/ Anne Y. Shields
                                            Anne Y. Shields
                                            United States Magistrate Judge