UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

FILED
CLERK
12:27 pm, Nov 08, 2019
U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

---------------------------------------------------------X

UNITED STATES OF AMERICA,

       -against-                          **MEMORANDUM OF
DECISION & ORDER**

TYRONE ROBINSON,                   16-CR-545 (S-4)(ADS)

---------------------------------------------------------X

**APPEARANCES:**

**United States Attorney's Office, Eastern District of New York**
*Attorneys for the United States*
610 Federal Plaza
Central Islip, NY 11722
      By:    Allen Lee Bode, Assistant United States Attorney, Of Counsel.

271 Cadman Plaza East
Brooklyn, NY 11201
      By:    Megan Elizabeth Farrell, Assistant United States Attorney, Of Counsel.

**Gary Schoer, Esq.**
*Attorney for the Defendant*
6800 Jericho Turnpike
Syosset, NY 11791

**SPATT, District Judge**:

On March 15, 2017, the Defendant Tyrone Robinson (the "Defendant") was charged in a third superseding indictment with 32 counts relating to nine gunpoint robberies and attempted robberies that occurred in Nassau County, as well as accompanying conspiracy and firearm charges.

Presently before the Court are several motions by the Defendant: to dismiss the alleged violations of 18 U.S.C. § 924(c) ("Section 924(c)") for failure to state a claim; for sanctions against the Government for alleged spoliation of exculpatory evidence; and to reopen a suppression

1

hearing concerning a cellphone recovered by New York State parole officers on June 10, 2016 (the "Parole Cellphone").

For the following reasons, the Court denies the Defendant's motions in their entirety

## I. BACKGROUND

On October 9, 2016, the Government filed a complaint against the Defendant charging him with alleged violations of 18 U.S.C. § 1951(a), Hobbs Act robbery, and 18 U.S.C. § 924(c), use of a firearm in furtherance of a crime of violence.

On January 11, 2017, the Government filed a 22-count indictment against the Defendant.

On March 10, 2017, the Government filed a superseding information adding additional charges for Hobbs Act robbery conspiracy and violation of Section 924(c).

On March 15, 2017, the Government filed a 32-count third superseding indictment charging the Defendant with multiple counts of Hobbs Act robbery, Hobbs Act attempted robbery, and Hobbs Act robbery conspiracy, 18 U.S.C. §§ 1951(a), 2 and 3551 *et seq.*; brandishing one or more firearms during crimes of violence, 18 U.S.C. §§ 924(c)(1)(A)(i), 924(c)(1)(A)(ii), 2 and 3551 *et seq.*; possession of a firearm by a felon, 18 U.S.C. §§ 922(g)(1), 924(a)(2) and 3551 *et seq.*; discharging one or more firearms during crimes of violence, 18 U.S.C. §§ 924(c)(1)(A)(i), 924(c)(1)(A)(ii), 924(c)(1)(A)(iii), 924(c)(1)(C)(i), 2 and 3551 *et seq.*; firearm-related murder, 18 U.S.C. §§ 924(j)(1), 2 and 3551 *et seq.*; and possession of ammunition by a felon, 18 U.S.C. §§ 922(g)(1), 924(A)(2) and 3551 *et seq.*.

On May 8, 2017, the Defendant filed several motions relating to the third superseding indictment, in relevant part seeking dismissal of the Section 924(c) charges and suppression of the evidence recovered from the Parole Cellphone.

On November 1, 2017, the Court denied the motion to dismiss, but referred the motion to suppress regarding the seizure of the Parole Cellphone for an evidentiary hearing.

On January 8, 2018, United States Magistrate Judge Anne Y. Shields conducted a suppression hearing and recommended denial of the Defendant's motion to suppress on January 16, 2018.

On February 17, 2018, the Court adopted the recommendation of Judge Shields over the objections of the Defendant's then-counsel Kevin Keating ("Keating").

On March 9, 2018, the Court appointed Robert LaRusso ("LaRusso") as defense counsel after the Defendant terminated his representation by Keating.

On April 27, 2018, LaRusso orally argued for reconsideration of the denial of the motion to suppress the Parole Cellphone, which the Court denied.

On August 16, 2018, after obtaining leave from the Court to submit additional suppression motions on the Defendant's behalf, LaRusso filed another set of motions which, *inter alia*, sought: suppression of evidence seized from a 2016 black Chrysler van located on March 26, 2016 by the Suffolk County Policy Department ("SCPD") near the crime scene (hereinafter, the "Rental Van"); suppression of evidence from a cellphone allegedly recovered on the roof of the crime scene by SCPD (the "Roof Cellphone"); reopening of the Parole Cellphone suppression hearing; and renewal of the Defendant's motion to dismiss all Section 924(c) firearms charges.

On November 13, 2018, the Court referred the motions to suppress evidence seized from the Rental Van and Roof Cellphone for an evidentiary hearing to Judge Shields and denied the remainder of the Defendant's motions.

On February 5 and 7, 2019, Judge Shields conducted a suppression hearing regarding the Rental Van and Roof Cellphone.

3

On February 9, 2019, the Defendant moved to reopen that hearing so he could introduce evidence that the SCPD arrested him on March 26, 2016 under false pretenses.

On February 18, 2019, the Court denied the Defendant's motion to reopen the suppression hearing, and subsequently ruled that a renewed motion to suppress on the basis of the Defendant's false arrest would be untimely on March 1, 2019.

On February 27, 2019, Judge Shields issued a Report and Recommendation ("R&R") recommending that the referred motions to suppress be denied.

On March 14, 2019, the Court adopted the R&R and denied the Defendant's motion to suppress.

On March 22, 2019, the Defendant terminated LaRusso's representation of him due to a potential conflict of interest.

On June 21, 2019, the Court appointed current counsel, Gary Schoer ("Schoer"), as primary counsel. The Court granted Schoer leave to submit additional motions, without prejudice to arguments by the Government that such motions were untimely.

On September 9, 2019, the Defendant submitted the instant motions.

## II. DISCUSSION

### A. AS TO THE TIMELINESS OF THE DEFENDANT'S MOTIONS.

Pursuant to Rule 12(c)(1), the Court may "set a deadline for the parties to make pretrial motions and may also schedule a motion hearing." Rule 12(c)(3) states that "if a party does not meet the deadline for making a Rule 12(b)(3) motion, the motion is untimely. But a court may consider the defense, objection, or request if the party shows good cause." Relatedly, Local Criminal Rule 49.1 provides that: "[a] motion for reconsideration or reargument of a Court order

determining a motion shall be filed and served within fourteen (14) days after the Court's determination of the original motion."

The Government does not appear to object to the timeliness of the Defendant's motion to dismiss the Section 924(c) charges, but argues that the remainder of the Defendant's motions are untimely collateral attempts to relitigate the Court's prior decisions. The Court agrees. As the Court already explained, the analysis of whether new evidence can justify filing of motions outside the court-mandated deadlines largely turns on the extent to which that evidence was available to the movant when the deadline passed. ECF 199 at 4–5. All of the information underlying the present motion was available to the Defendant at the time of the hearings at issue. As to the Subway restaurant surveillance recordings, the Defendant cited the Government's failure to recover the entire recording in his February 10, 2019 motion to reopen the suppression hearing with regard to the March 26, 2016 incidents. As for the pole camera, the Government informed the Defendant that the video images at issue no longer existed in response to a discovery demand on May 30, 2018. And the New York State Division of Parole Policy and Procedures Manual (hereinafter the "Policy Manual") is a published document that has been publicly available since 2004. Considering that the Defendant's primary contention is that the introduction of these pieces of evidence would have changed the outcome of the relevant proceedings, the Court finds no reasonable justification for the Defendant's failure to either introduce the arguments underlying the present motions at those hearings or, at the very least, within fourteen days of those hearings.

However, as it did with the Defendant's previous omnibus motion, the Court will excuse the Defendant's tardiness out of recognition that he is now represented by different counsel. *See United States v. Santillan*, No. 13-CR-138, 2015 WL 6115865, at *1 (S.D.N.Y. Oct. 15, 2015) (reaching merits of motion to reconsider "since there would be little purpose to denying this motion

5

on procedural grounds and requiring Defendant to raise the argument in a new motion to suppress"). The Court will therefore proceed to the merits of the Defendant's motions, but advises the Defendant and counsel that it may not so leniently extend the same courtesies for future motions.

**B. As to the Motion to Dismiss.**

Section 924(c)(1)(A) provides, in pertinent part:

[A]ny person who, during and in relation to any crime of violence . . . for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence . . .

(i) be sentenced to a term of imprisonment of not less than 5 years;

(ii) if the firearm is brandished, be sentenced to a term of imprisonment of not less than 7 years; and

(iii) if the firearm is discharged, be sentenced to a term of imprisonment of not less than 10 years.

18 U.S.C. § 924(c). "Crime of violence" is defined in two subparts: the elements clause, § 924(c)(3)(A), and the residual clause, § 924(c)(3)(B). The elements clause defines a "crime of violence" as a felony that "has as an element the use, attempted use, or threatened use of physical force against the person or property of another," whereas the residual clause defines it as a felony "that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." *Ibid.*

The third superseding indictment indicated that the crimes which formed the basis of the Section 924(c) violations are the numerous robberies and attempted robberies committed in violation of 18 U.S.C. § 1951(a), as well as the accompanying conspiracy to commit those robberies.

Section 1951(a) states that:

> Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both.

18 U.S.C. § 1951(a). The same section defines robbery as:

> [T]he unlawful taking or obtaining of personal property from the person or in the presence of another, against his will, by means of actual or threatened force, or violence, or fear of injury, immediate or future, to his person or property, or property in his custody or possession, or the person or property of a relative or member of his family or of anyone in his company at the time of the taking or obtaining . . . .

Id. § 1951(b).

In *United States v. Davis*, 139 S. Ct. 2319, 204 L. Ed. 2d 757 (2019), the Supreme Court ruled that Section 924(c)'s residual clause was unconstitutionally vague, such that the Government could not rely on a Hobbs Act conspiracy as a predicate crime of violence to obtain heightened criminal penalties under that provision. The Defendant's motion to dismiss originally sought dismissal of the third superseding indictment's Section 924(c) counts pursuant to *Davis*. However, after the Defendant filed his motion, the Government charged a fourth superseding indictment which uncoupled the Section 924(c) counts from the Hobbs Act conspiracy counts. As a result, the only remaining Section 924(c) counts are the Government's charges that the Hobbs Act robberies and attempted robberies constituted crimes of violence under the elements clause.

The Defendant nonetheless seeks dismissal of these counts, claiming that neither robbery nor attempted robbery are cognizable crimes of violence because they can be committed without violent physical force. The Defendant is incorrect on both counts.

"To determine whether an offense is a crime of violence [under the elements clause], courts employ what has come to be known as the 'categorical approach.'" *United States v. Hill*, 890 F.3d 51, 55 (2d Cir. 2018) (citing *Taylor v. United States*, 495 U.S. 575, 600 (1990)); *see also United States v. Acosta*, 470 F.3d 132, 135 (2d Cir. 2006) (per curiam) (applying the categorical approach to determine whether a predicate crime was a crime of violence under Section 924(c)). The categorial approach is "'not only consistent with both precedent and sound policy' but[ ] also ... 'necessary in view of the language of the applicable statutes.'" *Id.* (quoting *Vargas–Sarmiento v. U.S. Dep't of Justice*, 448 F.3d 159, 167 (2d Cir. 2006)).

"Under the categorical approach, courts identify 'the minimum criminal conduct necessary for conviction under a particular statute.'" *Id.* (quoting *Acosta*, 470 F.3d at 135). "In doing so, courts 'look only to the statutory definitions' — i.e., the elements — of [the] ... offense[ ], and *not* 'to the particular [underlying] facts.'" *Id.* (quoting *Descamps v. United States*, 570 U.S. 254, 257 (2013)). It is not appropriate for the reviewing court to "'go behind the offense as it was charged to reach [its] own determination as to whether the underlying facts' qualify the offense as, in [each] case, a crime of violence." *Id.* at 55–56 (quoting *Ming Lam Sui v. INS*, 250 F.3d 105, 117–18 (2d Cir. 2001)). Rather, "the categorical approach requires [the reviewing court] to consider the minimum conduct necessary for a conviction of the predicate offense ... and then to consider whether such conduct amounts to a crime of violence under § 924(c)(3)(A)." *Id.* at 56.

As the Court will explain in the following sections, Hobbs Act robberies and attempted robberies fall within the definition of a crime of violence under the categorical approach.

### 1. As to Hobbs Act Robbery.

The Defendant is well aware that the Second Circuit expressly held that Hobbs Act robbery qualifies as a crime of violence under the elements clause in *United States v. Hill*, 890 F.3d 51 (2d

Cir. 2018). Indeed, this is the Defendant's third request that the Court depart from the Second Circuit's ruling. Now, the Defendant attempts to justify his argument by claiming that *Hill* is no longer good law "in light of" the Supreme Court's decision in *Davis*.

However, the Second Circuit in *United States v. Barrett*, 937 F.3d 126 (2d Cir. 2019) reaffirmed the validity of *Hill*, notwithstanding the Supreme Court's ruling in *Davis*. As the Second Circuit recognized, *Davis* only addressed the constitutionality of Hobbs Act conspiracy convictions under the residual clause, meaning it has no bearing on charges of substantive Hobbs Act robbery under the elements clause. *See id.* at 128 ("Neither party argues that *Davis* requires vacatur of Barrett's Count Four, Six, or Seven § 924(c) convictions. This is not surprising. The predicate offense for each of these crimes is *substantive* Hobbs Act robbery, which can be identified as a crime of violence under § 924(c)(3)(A) applying the traditional, elements only, categorical approach not at issue in *Davis*.").

The Defendant concedes the applicability of *Barrett*, as he must, but argues that the Second Circuit misconstrued the scope of the elements clause by interpreting it to encompass such charges. *See* ECF 254-1 at 10–11 (submitting his argument "*notwithstanding* the Second Circuit's ruling in *United States v. Hill*, 832 F.3d 135 (2d Cir. 2016) as amended 890 F.3d 51 (2d Cir. 2018) and that Court's recent decision on remand from the Supreme Court in *United States v. Barrett*, 2019WL4121728 (2d Cir. August 30, 2019)" (emphasis added)). He cites nothing in *Davis* that would compel a departure from *Hill*, let alone post-*Barrett* case law illustrating that the Second Circuit erred in its interpretation of *Davis*. Instead, he points the Court to a slew of out-of-circuit and pre-*Hill* cases supposedly contradicting the outcome reached by the Second Circuit. Put another way, the Defendant simply disagrees with the law of this Circuit.

Even if the Court found those cases persuasive, or if the Defendant identified a holding of *Davis* ignored by the Second Circuit in *Barrett*, the Court is in no position to ignore an explicit ruling of the Second Circuit. The Court registers the Defendant's objection to the state of the law. But, at a fundamental level, it cannot overrule a higher court. As far as the Court is concerned, the issue is beyond well-settled.

Therefore, the Court denies the Defendant's motion to dismiss with respect to Counts 6, 12, 15, 21, and 27 of the fourth superseding indictment.

### 2. As to Attempted Hobbs Act Robbery.

Unlike the Defendant's attempts to gain dismissal of the Section 924(c) charges predicated on Hobbs Act robbery, the portion of the motion regarding attempted Hobbs Act robberies presents a novel, previously un-addressed argument. The Second Circuit has yet to determine whether attempted Hobbs Act robbery constitutes a crime of violence within the meaning of the elements clause. *United States v. Jefferys*, No. 18-cr-359, 2019 WL 5103822, at *7 (E.D.N.Y. Oct. 11, 2019) ("[T]he Second Circuit has yet to determine whether attempted Hobbs Act robbery qualifies as a crime of violence under § 924(c)'s elements clause.").

However, the only district court in the Second Circuit to address the issue, along with several courts from other circuits, has "conclude[d] that attempted Hobbs Act robbery constitutes a crime of violence under § 924(c)'s elements clause" and thus "may sustain a § 924(c) charge." *Id.* at *8; *see also, e.g.*, *United States v. St. Hubert*, 909 F.3d 335, 351 (11th Cir. 2018) ("attempted Hobbs Act robbery qualifies as a crime of violence under § 924(c)(3)(A)'s use-of-force clause because that clause expressly includes 'attempted use' of force"); *Hill v. United States*, 877 F.3d 717, 719 (7th Cir. 2017) ("When a substantive offense would be a violent felony under § 924(e) and similar statutes, an attempt to commit that offense also is a violent felony."). On the other end

of the spectrum, there appears to be no precedential opinion concluding otherwise; the only opinions to do so being dissents and concurrences. *See United States v. St. Hubert*, 918 F.3d 1174, 1210 (11th Cir. 2019) (Jill Pryor, J., dissenting); *Hyler v. United States*, 896 F.3d 1219, 1224–26 (11th Cir. 2018) (Jill Pryor, J., concurring).

The Court concurs with the courts that consider attempted Hobbs Act robbery a crime of violence under the elements clause. Placing such charges outside the reach of Section 924(c) would run afoul of the plain language of the statutes at issue, as well as analogous Second Circuit case law. The elements clause expressly includes the "attempted use" or "threatened use" of force within its definition of crime of violence. Therefore, if a completed Hobbs Act robbery involves the requisite use of force to qualify as a crime of violence, *see supra* Section II.A.1., then a necessary implication is that an attempt to commit the same crime constitutes an attempted use of force. *See St. Hubert*, 909 F.3d at 351 ("because the taking of property from a person against his will in the forcible manner required by § 1951(b)(1) necessarily includes the use, attempted use, or threatened use of physical force, then by extension the attempted taking of such property from a person in the same forcible manner must also include at least the 'attempted use' of force."); *United States v. Edwards*, No. 03-cr-204, 2019 WL 3347173, at *3 (E.D. Va. July 25, 2019) (same).

For essentially the same reason, Second Circuit case law analyzing similar predicate crimes "indicate[s] that where a substantive offense is a crime of violence under § 924(c), an attempt to commit that offense similarly qualifies under the elements clause." *Jefferys*, 2019 WL 5103822, at *7; *United States v. Scott*, 681 F. App'x 89, 95 (2d Cir. 2017) ("Attempted murder in the second degree is a crime unmistakably involving 'an attempted use ... of physical force' within § 924(c)(3)(A)." (ellipses in original)). The Second Circuit has given similar treatment to attempts

under other statutes requiring a predicate act of violence. *See United States v. Thrower*, 914 F.3d 770, 777 (2d Cir. 2019) ("We therefore conclude that the New York offense of attempted robbery in the third degree is a "violent felony" under ACCA."); *United States v. Walker*, 442 F.3d 787, 789 (2d Cir. 2006) (holding that attempted New York assault is a "violent felony" under the Armed Career Criminal Act); *Leyones v. United States*, No. 10-cr-743, 2018 WL 1033245, at *5 (E.D.N.Y. Feb. 22, 2018) (finding that attempted bank robbery under 18 U.S.C. § 2113 constitutes a crime of violence under the elements clause).

The Defendant considers attempted Hobbs Act robbery distinguishable from the aforementioned crimes, because "[o]ne can . . . commit attempted Hobbs Act Robbery without using, threatening to use, or attempting to use physical force." ECF 254-1 at 8. In his view, an attempt only requires that an individual take a "substantial step" towards completion of the crime. Thus, a person could hypothetically attempt a Hobbs Act robbery without violent means by, for example, purchasing disguises or reconnoitering a location.

The Defendant's hypothetical is insufficient under the categorical approach, which looks to what an offense *typically* entails. *See Davis*, 139 S. Ct. at 2328–29 ("[I]n connection with the elements clause, the term 'offense' carries . . . [a] 'generic' meaning. . . . So in plain English, when we speak of the nature of an offense, we're talking about 'what an offense normally—or, as we have repeatedly said, 'ordinarily'—entails, not what happened to occur on one occasion" (quoting *Sessions v. Dimaya*, 138 S. Ct. 1204, 1216 (2018)). "[T]o show a predicate conviction is not a crime of violence" there must be more than "'a theoretical possibility[]' that the statute at issue could be applied to conduct that does not constitute a crime of violence." *Hill*, 890 F.3d at 56 (quoting *Gonzales v. Duenas-Alvarez*, 549 U.S. 183, 193 (2007)). The Defendant's speculation about the particulars of theoretical would-be robbers is the exact sort of conduct-specific analysis

rejected by the categorical approach. *See id.* at 57–59 (rejecting hypotheticals offered to argue that Hobbs Act robbery is not categorically a crime of violence); *United States v. Biba*, 395 F. Supp. 3d 227, 234 (E.D.N.Y. 2019) ("[T]he court rejected the defendant's argument that a Hobbs Act robbery could be committed without 'using or threatening the use of physical force' by, for example, poisoning a victim").

In addition, the Defendant's argument relies on a faulty interpretation of what constitutes a "substantial step." The term does not encompass every single action taken in furtherance of a robbery. *See United States v. Anderson*, 747 F.3d 51, 73–74 (2d Cir. 2014) (quoting *United States v. Celaj*, 649 F.3d 162, 171 (2d Cir. 2011)) ("[F]or a defendant to have taken a 'substantial step,' he must have engaged in more than 'mere preparation,' but may have stopped short of 'the last act necessary' for the actual commission of the substantive crime."). Rather, the person charged must go beyond mere preparation and take affirmative actions "planned clearly to culminate" in a robbery. *United States v. Farhane*, 634 F.3d 127, 145 (2d Cir. 2011). Moreover, "[c]onduct is not considered a substantial step unless it is strongly corroborative of the criminal intent of the accused." *United States v. Davis*, 8 F.3d 923, 927 (2d Cir. 1993); *see also United States v. Pugh*, 937 F.3d 108, 119 (2d Cir. 2019) ("[I]n order for behavior to be punishable as an attempt, . . . it must be necessary to the consummation of the crime and be of such a nature that a reasonable observer, viewing it in context could conclude beyond a reasonable doubt that it was undertaken in accordance with a design to violate the statute."). As a result, commission of an attempted Hobbs Act robbery requires actions indicative of some sort of violent intent. *See Hill*, 877 F.3d at 719 ("[C]onviction of attempt requires proof of intent to commit all elements of the completed crime").

The case relied upon by the Defendant to supposedly show that nonviolent conduct may qualify as an attempted robbery, *United States v. Jackson*, 560 F.2d 112 (2d Cir. 1977),

demonstrates the necessity of violent intent to convict a defendant for said crime. As the Defendant concedes, the defendants in that case "[o]n two separate occasions, . . . reconnoitered the place contemplated for the commission of the crime and possessed the paraphernalia to be employed in the commission of the crime[,] loaded sawed-off shotguns, extra shells, a toy revolver, handcuffs, and masks which [were] specially designed for such unlawful use and which could serve no lawful purpose under the circumstances." *Id.* at 120.

The Second Circuit found the defendants' actions to be a substantial step towards commission of the robbery because their conduct "strongly corroborated their criminal purpose." *Id.* It reached that conclusion not because the defendants reconnoitered the premises, as the Defendant alleges, but rather because "on both occasions these men were seriously dedicated to the commission of a crime, had passed beyond the stage of preparation, and would have assaulted the bank had they not been dissuaded by certain external factors." *Id.* Therefore, committing an attempted Hobbs Act robbery requires much more than simply purchasing masks or reconnoitering a location. The offender must undertake significant conduct directed at accomplishing the violent end of the completed robbery itself.

As a result, the Court is satisfied that the minimum conduct necessary to commit an attempted Hobbs Act robbery amounts to a crime of violence under the elements clause. Accordingly, the Court denies the Defendant's motion to dismiss with respect to Counts 3, 9, 18, 24, and 29 of the fourth superseding indictment.

## C. AS TO SPOLIATION.

The Defendant seeks spoliation sanctions due to the alleged destruction of: (1) a March 26, 2016 video of a Subway parking lot located near the crime scene, from which SCPD seized evidence; (2) video from a pole camera placed outside the front of the Defendant's residence

between May 3, 2016 and August 6, 2016; and (3) the warrant underlining the Defendant's June 10, 2016 parole arrest.

A defendant is entitled to dismissal based on spoliation of evidence if: (1) the evidence possessed "exculpatory value that was apparent before it was destroyed," (2) the defendant would be "unable to obtain comparable evidence by other reasonably available means," and (3) the government acted in bad faith. *United States v. Greenberg*, 835 F.3d 295, 303 (2d Cir. 2016) (quotation marks omitted); *Illinois v. Fisher*, 540 U.S. 544, 547–48, 124 S.Ct. 1200, 157 L.Ed.2d 1060 (2004); *California v. Trombetta*, 467 U.S. 479, 489, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984). "Failure to satisfy any of these requirements, including a failure to show the Government's bad faith, is fatal to a defendant's spoliation motion." *Greenberg*, 835 F.3d at 303.

For the following reasons, the Court denies the Defendant's motion. Before discussing the particulars of the disputed pieces of evidence, the Court notes that the Defendant's argument fails in each case for largely the same reason—a total lack of evidence of bad faith on the part of the Government. Generally speaking, the Defendant's argument is as follows: certain evidence was destroyed; upon "information and belief" he thinks that evidence would have been helpful to him; *ergo*, the Government destroyed the evidence in bad faith. Assuming the Defendant established the exculpatory value of the evidence, which is uncertain, his baseless speculation regarding the Government's motives is wholly insufficient to carry the heavy burden required to obtain dismissal of his charges. With that in mind, the Court will address each piece of evidence in turn.

### 1. As to the Subway Camera.

On March 26, 2016, SCPD seized evidence from the Rental Van, which was located nearby the crime scene in a Subway parking lot. SCPD examined video images from a surveillance camera at the Subway restaurant. According to the Defendant, the Government only delivered a portion of

the video examined by law enforcement during discovery, and advised him "that the balance of the video delivered to the Suffolk County Police Department has been lost or destroyed." ECF 254-1 at 16. The Defendant contends "upon information and belief" that the destroyed portions of the video would have confirmed that SCPD, in fact, recovered the Roof Cellphone from the Rental Van and, further, that the members of SCPD who testified at the suppression hearing, P.O. David Vlacich ("Officer Vlacich") and Detective Vincent Callahan ("Detective Callahan"), submitted false testimony.

The Defendant's argument is premised on a mischaracterization of the status of the Subway surveillance recordings. Officer Vlacich and Detective Callahan, who were cross-examined concerning the Subway video, testified that SCPD never received a full recording of March 26, 2016. Rather, the Subway owner showed certain video clips to Officer Vlacich the night of the incident. *See* ECF 265-7 at 188:3–24, 191:2–23, 272:10–19; ECF 265-8 at 375:7–376:9. Officer Vlacich did not recover the entire day's recording from the Subway camera system that night, only observing what was shown to him by the restaurant owner. ECF 265-7 at 218:21–220:4; 192:21–193:20. The actual recording was recovered by electronics detectives who returned at a later date. *Id.* at 191:24–192:2. Those detectives failed to recover everything observed by Officer Vlacich. *Id.* at 192:3–5, 195:1–23.

Importantly, the Defendant previously admitted the veracity of this testimony, only changing course for the purpose of the present motion. *See* ECF 174 at 6 n.6 (objecting to Officer Vlacich's reference to "another Subway video that *was never recovered by the police*, a video from a Subway camera that caught a portion of the Van, including the driver's side, rear hatch and a portion of his police vehicle" (emphasis added)), *id.* (explaining that "the police recovered and

reproduced only a very short portion of the camera surveillance from the Subway Restaurant" and that certain segments "were never retrieved by the police").

Now, the Defendant submits that the testimony of Officer Vlacich and Detective Callahan was false. According to the Defendant, the notes of Detective Callahan and Detective William Berhalter ("Detective Berhalter") demonstrate that law enforcement had the entire video and failed to produce it. However, the evidence the Defendant cites confirms, rather than contradicts, the testimony at the suppression hearing.

First, the Defendant cites notations regarding events outside the camera time (6:38 p.m. to 6:59 p.m.) given to him in discovery. ECF 276-1 at 3. These notes are impressions of the video taken when Detectives Callahan and Berhalter returned to the Subway restaurant on either March 27 or 28, 2016. They do not establish that the Subway restaurant actually furnished the entire recording to SCPD. Indeed, SCPD's records show that the electronic discovery team did not recover the video until March 29, 2016. ECF 279-1 at 3. Therefore, it is apparent that Detectives Callahan and Berhalter took the notes before SCPD was in possession of the surveillance recordings produced in discovery. In other words, the notes are not based off of footage withheld by the SCPD.

Second, the Defendant cites a portion of another note purportedly indicating that the Subway restaurant gave a video to a SCPD detective on March 28, 2016. ECF 276-1 at 3. However, this note is not referring to the Subway video. It is describing a conversation between Detective Berhalter and one of the residents of the first-floor apartment at the crime scene. The phrase "given to Det 1472 on 3/28/16 by" indicates that the statements came from the downstairs neighbor, not from portions of a video provided by a Subway employee. ECF 279 at 11.

Third, the Defendant cites still images taken in daylight of vehicles and license plates, as well as a note describing an individual knocking on the door and dropping off heroin. ECF 276-1 at 4–7. The Defendant infers that SCPD obtained these images and notes from an unproduced portion of the Subway video. In reality, the still images were taken from downstairs at the residence, not the Subway video. The notes contain information obtained from a resident regarding those videos. ECF 279 at 11–12. They have nothing to do with the Subway video.

Looking at the evidence as a whole, it is apparent that the Government never possessed the video recordings at issue, let alone destroyed them in bad faith. Ultimately, the party in control of the surveillance cameras was the Subway restaurant—a third party—not the SCPD or the Government. While a case can be made that SCPD erred significantly by failing to recover the entire recording from the restaurant, that does not make the restaurant's failure to preserve the evidence chargeable to the Government. The Government bears no constitutional duty to seize potentially relevant documents from a third party simply because they might be exculpatory. *Greenberg*, 835 F.3d at 303 (denying request for spoliation sanctions based on the government's "deficient and incomplete" copying of computer hard drives because defendant had "not provide[d] substantive support for his argument that the failure to collect evidence could ground a due process claim").

Therefore, it cannot be said that the Government spoliated evidence. *See United States v. Watts*, 934 F. Supp. 2d 451, 478 (E.D.N.Y. 2013) (denying spoliation sanctions where defendant "characterize[d] the government as having failed to preserve the documents discussed on the recordings," because "the government [could not] be said to have ever actually possessed or controlled said documents"); *Poux v. Cty. of Suffolk*, No. 09-cv-3081, 2012 WL 1020302, at *19 (E.D.N.Y. Mar. 23, 2012) (denying request for spoliation sanctions where there was "no evidence

in the record from which a reasonable juror may infer, *inter alia*, that they ever had control over the allegedly lost or destroyed videotapes or played any part in the destruction of the videotapes"); *Creighton v. City of New York*, No. 12-cv-7454, 2017 WL 636415, at *18 (S.D.N.Y. Feb. 14, 2017) ("Plaintiff's spoliation claim is—as to the surveillance footage—premised on the notion that the NYPD was legally obligated to seize the Mini Mart DVR. Spoliation sanctions address the destruction, alteration, or loss of evidence in a party's control, however, and the Mini Mart DVR was owned and maintained by Terab, a private third-party."); *Sachs v. Cantwell*, No. 10-cv-1663, 2012 WL 3822220, at *9 (S.D.N.Y. Sept. 4, 2012) (denying spoliation sanctions stemming from government's alleged failure to collect surveillance tapes because "spoliation sanctions are applicable only when a party loses or destroys evidence, not when he or she fails to collect it.").

Assuming the recording possessed the exculpatory value asserted by the Defendant, he nevertheless failed to put forward sufficient evidence to establish either control over or bad faith destruction of the portions at issue. *Greenberg*, 835 F.3d at 303 (explaining that to "raise[] a due process issue regarding the failure to preserve evidence . . . the record must first show that evidence has been lost and that this loss is chargeable to the State"); *Watts*, 934 F. Supp. 2d at 479 n.9 ("[E]ven assuming, arguendo, that the government had previously possessed and destroyed relevant evidence, . . . There is no evidence or argument here that the government acted in bad faith, even if it did not collect all of the documents discussed in the recordings."). Accordingly, the Court denies the Defendant's motion with respect to the Subway video.

### 2. As to the Pole Camera.

Following the final charged robbery murder, law enforcement placed a pole camera near the front of the residence where the Defendant rented a second floor apartment between May 10, 2016 and August 6, 2016. A July 8, 2016 federal search warrant affidavit referenced the pole

camera, stating "[a] detective observing the SUBJECT PREMISES from a pole camera on May 19, 2016 observed what appeared to be possibly plastic zip ties being carried by TYRONE ROBINSON into the SUBJECT PREMISES." ECF 265-15 ¶ 17. The only remaining recordings from the pole camera are the two inculpatory still images referenced in the warrant application. Just like the Subway video, the Defendant contends that the lost recordings from the pole camera are exculpatory.

Unlike the Subway video, the Government possessed some sort of control of the video recordings. According to the Government, the video from the pole camera was stored by a contractor of the Nassau County Police Department ("NCPD") located in Arizona. NCPD failed to download the video from the Arizona company at the time the detective observed the Defendant carrying plastic zip ties, and the video data "no longer existed" with the company by the time of the Defendant's discovery demand. Although the Government provides very little information regarding the relationship between the NCPD and the Arizona contractor, the Court will assume for the purpose of this motion that the contractor acted as an agent of the NCPD, such that NCPD possessed the contractual right to request the data on demand. Thus, the situation is more analogous to cases where the prosecution lost or destroyed evidence than a failure to collect evidence.

Nevertheless, the Defendant's motion fails to sufficiently articulate either the potentially exculpatory value of the evidence or the existence of bad faith on the part of the Government.

Starting with the relevance of the pole camera recordings, the Defendant contends that "[u]pon information and belief, many of these images would be exculpatory and would establish, *inter alia*, that, contrary to the testimony of the parole officers at the suppression hearing relating to that which occurred on June 10, 2016, law enforcement remained in the – Defendant's home, after he was in custody and removed from the house, conducting an unauthorized search for

evidence against the Defendant with respect to the charges in the instant Indictment." ECF 254-1 at 17. The Defendant's argument is little more than another attempt to collaterally attack an already-decided issue. As the Court noted in its order denying the Defendant's motion to suppress the cocaine and money seized during the execution of the parole warrant, the "stalking horse" theory has no validity in the Second Circuit. ECF 84 at 24 (citing *United States v. Reyes*, 283 F.3d 446, 459 (2d Cir. 2002); *United States v. Chandler*, 164 F. Supp. 3d 368, 380–81 (E.D.N.Y. 2016) (Spatt, J.)). Even if the pole camera depicted the events described by the Defendant, it would not result in reconsideration of the Court's prior decision.

Moreover, notwithstanding the recordings' *relevance* to the case, it is unclear what *exculpatory* value they would have. The fact that law enforcement "remained in his home, after he was in custody and removed from his house, conducting an unauthorized search for evidence" would not establish anything that clears him of guilt for the crimes charged. ECF 276 at 3. Importantly, law enforcement placed the camera outside his apartment after the alleged crimes took place. Therefore, it is unclear how the loss of this evidence would have materially aided the Defendant in establishing his innocence. *See United States v. Morgenstern*, 933 F.2d 1108, 1116 (2d Cir. 1991) ("The finding of a lack of substantial prejudice is supported by . . . the fact that the allegedly missing materials would not, to any significant extent, have served affirmatively to establish Morgenstern's innocence"); *United States v. Barnes*, 411 F. App'x 365, 369 (2d Cir. 2011) (affirming denial of spoliation sanctions where defendant's "contention that independent DNA testing could have proven that the victim's DNA was present on the bills solely as a result of his handling of the bills would have failed to establish his innocence").

Also, assuming the Defendant cleared that hurdle, he has not even alleged that the Government destroyed the evidence in bad faith, let alone established it. At most, his motion

asserts that NCPD acted in bad faith when searching his apartment, but that is a separate incident, encompassing a different mental state, than the one subject to the Defendant's motion. Namely, the Court cannot dismiss the charges against the Defendant absent evidence that the Arizona contractor intentionally deleted the video data at the behest of the Government. *See Greenberg*, 835 F.3d at 305 (denying spoliation sanctions when "FTC in a civil action had access to computer data that was not successfully imaged on the first attempt and that a complete image was never thereafter obtained by criminal investigators" due to absence of bad faith); *In re Terrorist Bombings of U.S. Embassies in East Africa*, 552 F.3d 93, 148 (2d Cir. 2008) ("Even if the government had been under an obligation to preserve the tapes, [appellant] has pointed to no evidence that the tapes were intentionally destroyed, and therefore the destruction of the tapes could not have amounted to spoliation.").

To the extent that the Defendant cites authority to the contrary, the Court notes that those cases involves civil disputes where parties bear an obligation to preserve evidence once they are on notice of the potential for litigation. No such obligation exists in criminal proceedings. *Watts*, 934 F. Supp. 2d at 478 ("Most of the cases cited by Mr. Watts are distinguishable from this case because they involve civil litigations in which there was no question that the allegedly spoliating party previously possessed and controlled the evidence at issue before allowing it to be destroyed"); *cf. also Greenberg*, 835 F.3d at 304 (rejecting argument that spoliation can be established through "carelessness in preserving documents of obvious relevance and importance")

Accordingly, the Court denies the Defendant's motion with respect to the pole camera.

### 3. As to the Parole Warrant.

In his motion, the Defendant alleged that the Government "advised" him "that the Parole Warrant that led to his arrest on June 10, 2016 no longer exists, despite regulation and policy

requiring its preservation." ECF 254-1 at 17. However, the Defendant based this accusation on a misunderstanding arising from his counsel's correspondence with the Government. The Government attached a copy of the Parole Warrant to its opposition, which the Defendant failed to object to in his reply. The Defendant therefore failed to establish the necessary predicate for a spoliation sanction, namely, the destruction of evidence. Accordingly, the Court denies the Defendant's motion with respect to the Parole Warrant.

### D. AS TO THE MOTION TO REOPEN THE PAROLE CELLPHONE HEARING.

On June 10, 2016, New York parole officers Pedro Torres ("Officer Torres") and Eleanor Evans ("Officer Evans") seized the Parole Cellphone pursuant to the Defendant's arrest in his residence. The Court previously denied a motion to suppress evidence seized from that cellphone after referring the motion to Judge Shields for a limited hearing regarding whether the seizure was rationally and reasonably related to the parole officers' duties. Entertaining a motion for reconsideration of that order, on November 13, 2018, the Court reached the same conclusion, explaining:

> The Court concurs with Judge Shields's decision to "credit[] the testimony of Torres and Evans with respect to the existence of a safekeeping policy, and its relation to their duties." ECF 91 at 10. Judge Shields noted the objections raised by the Defendant and found: "Despite the lack of clear and consistent record-keeping, the witness testimony in this case established that Torres and Evans properly acted pursuant to policy, and in Robinson's interest when deciding to take his cell phone. They were motivated by nothing more than the desire to ensure that Robinson would have quick access to his cell phone, and all of the information contained therein upon his release." *Id.* at 13. Judge Shields emphasized that "there was no evidence that Parole takes cell phones into safekeeping to further any criminal investigation" and that "[n]either witness searched the content of Robinson's cell phone." *Id.* The Court agrees with the R&R that the potential vagaries and inconsistencies in the witnesses'[] testimony do not disprove the existence of the safekeeping policy, or that such safekeeping was reasonably and rationally related to furthering the caseworker duties of parole officers.

ECF 158 at 41.

The Defendant seeks either dismissal of the indictment or reopening of the suppression hearing on the ground that Officers Torres and Evans committed perjury. The Defendant bases his accusation on his apparent discovery of the Policy Manual subsequent to the hearing. According to the Defendant, the Policy Manual contains a provision stating that "when a Parole Officer takes a releasee's money or property for casework, investigative or custodial reasons, the Officer will document this action," and also sets forth specific recordkeeping procedures. ECF 254-3. Therefore, according to the Defendant, Officers Torres and Evans committed perjury by testifying that no written policy existed regarding the seizure of parolee cellphones.

The Court rejects the Defendant's hypothesis. Although the Policy Manual would have certainly been probative to the issues raised in the evidentiary hearing, it is entirely insufficient to establish entitlement to the dramatic relief sought by the Defendant. Standing alone, the Policy Manual simply undermines the credibility of the officers' statements. It only transforms into a perjury claim when combined with the supposition that the officers were aware of the Policy Manual and knowingly lied about its contents. *See United States v. Dunnigan*, 507 U.S. 87, 94, 113 S. Ct. 1111, 1116, 122 L. Ed. 2d 445 (1993) ("A witness testifying under oath or affirmation [commits perjury] if she gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory."). What evidence does the Defendant put forward to support this insinuation? Only his own conjecture. He asserts that Officers Torres and Evans were "clearly aware" of the procedures due to their status as "experienced Parole Officers," but he provides nothing directly corroborating his pernicious inference. ECF 254-1 at 24; *see also id.* at 25 ("the Defendant submits that the Government, aware of general, regular and universally common, law enforcement policies and regulations, knew, or should have known, that this testimony was false."). While it might be reasonable at a surface level

to assume that parole officers are aware of the Policy Manual and its contents, that assumption does not itself establish such awareness as a factual matter. Put simply, the existence of a document is a fact separate from an individual's *knowledge* of that document.

The only circumstantial evidence the Defendant cites to corroborate his accusation is that another parole officer obtained vouchers and receipts when taking the Defendant's decorative swords for safekeeping. Inferring that Officers Torres and Evans knew of and thus lied about the Policy Manual from this fact alone requires making an enormous logical leap. Cellphones possess practical uses to parolees, such as enabling them to contact family members, and are not inherently dangerous. On the other hand, swords are weapons. They have no practical utility and could be dangerous if not carefully stored. Therefore, the most reasonable inference from the vouchering of the decorative swords is not that Officers Torres and Evans lied about the vouchering of cellphones. It is just as likely, if not more, that the Suffolk area parole office required the vouchering of weapons, but not cellphones. The Court cannot assume the contrary just because the Defendant says it is so. *See Dansby v. United States*, 291 F. Supp. 790, 793 (S.D.N.Y. 1968) ("A petitioner seeking to vacate a judgment of conviction allegedly based on perjured testimony has the burden of establishing that the testimony was perjured, that it was material to his conviction and that the government either participated in the perjury or had knowledge of it.").

Confirming the Court's suspicion, the version of the Policy Manual in force at the time of the execution of the parole warrant indicates that the document merely serves as a "general reference and consistent direction source" of department procedures. New York State Corrections and Community Supervision Directive 0001, *Introduction to the Policy and Procedure Manual* (Sept. 2, 2015), http://www.doccs.ny.gov/Directives/0001.pdf. It is not widely circulated to parole officers. Rather, the Department distributes it on a limited basis to "Central Office Executive Team

Members, the Chairperson of the Board of Parole, Division Heads, Regional Directors, Superintendents, Bureau Chiefs, and other appropriate Central Office staff." *Id.* at 7; *see also generally* at 4–5. The Court thus sees no reason to charge knowledge of the specific contents of its provisions to Officers Torres and Evans.

Moreover, the Defendant cites no authority supporting the conclusion that courts may dismiss indictments before trial due to the elicitation of false testimony at a suppression hearing. Although it may in certain circumstances entitle a convicted defendant to a new trial, that logic does not hold in situations like this where there has been no opportunity for the jury to be tainted by the allegedly perjurious testimony. *See Jenkins v. Artuz*, 294 F.3d 284, 295 (2d Cir. 2002) (affirming district court's grant of writ of habeus corpus where there was a "reasonable likelihood that [a party's] false testimony ... affected the judgment of the jury"); *United States v. Wallach*, 935 F.2d 445, 456 (2d Cir. 1991) ("Whether the introduction of perjured testimony requires a new trial depends on the materiality of the perjury to the jury's verdict and the extent to which the prosecution was aware of the perjury."). Even assuming the truth of the Defendant's accusations, the most relief the Court could afford the Defendant is reopening the suppression hearing.

The standard for whether to reopen suppression hearings to introduce new evidence is unsettled in the Second Circuit. *See United States v. Bayless*, 201 F.3d 116, 131 (2d Cir. 2000) (declining to decide whether the movant must "proffer a justification for its failure to present the relevant evidence at the original suppression hearing"); *United States v. Matos*, No. 07-cr-870, 2008 WL 5169112, at *1 (E.D.N.Y. Dec. 8, 2008) ("The Second Circuit has expressly deferred the question of what legal standard applies to a motion to re-open a suppression hearing."). The majority of lower courts have settled on the following standard: "in order to reopen a suppression hearing on the basis of new evidence, the moving party, whether it is the government or the

defendant, must show that the evidence 'was unknown to the party, and could not through due diligence reasonably have been discovered by the party, at the time of the original hearing." *United States v. Leaver*, 358 F.Supp.2d 273, 279 & n. 30 (S.D.N.Y.2005) (collecting cases). *But see Matos*, 2008 WL 5169112, at *2 ("Though the Second Circuit has yet to comment upon this line of cases, it is clear that they impose a standard more stringent than that invoked in *Bayless* itself"). Without ruling on the validity of that standard, the Court notes that it appears that a movant seeking to reopen a hearing must provide *some* justification for his or her failure to introduce the evidence at the original suppression hearing. *Bayless*, 201 F.3d at 131 (affirming reopening of hearing because "government adequately justified its decision not to introduce the testimony of Sergeant Bentley at the original suppression hearing").

Here, the Defendant provides no discernible justification for his failure to introduce the Policy Manual at the original suppression hearing other than that he "discovered" it subsequent to the hearing. The Policy Manual is not documentation of a discrete fact hidden from the Defendant prior to the hearing. It is a published document that has been publicly available for fifteen years. Officers Torres and Evans were subject to cross-examination at the hearing, and the apparent absence of a written policy was explicitly addressed in the Court's order referring the motion for a hearing. ECF 83 at 25 ("The Government did not submit any affidavits from parole officers, or any parole handbooks or guidebooks in support of this assertion."). Then-counsel's failure to exercise the necessary diligence to find the Policy Manual prior to the hearing is not an adequate justification for revisiting the Court's decision.

Bolstering that conclusion, it is not even clear to the Court that inclusion of the Policy Manual in the suppression hearing would have changed the outcome. *See United States v. Valentine*, 591 F. Supp. 2d 238, 243 (E.D.N.Y. 2008) ("even if the court fully credits as accurate

and credible the government's assertions regarding the existence and contents of this DEA policy, the proffered evidence would not alter the court's attenuation analysis. Thus, it would be futile to reopen the suppression hearing for the sole purpose of introducing the proffered DEA policy."); *United States v. Pena Ontiveros*, 07–cr–804, 2008 WL 2446824, *4 (S.D.N.Y. Jun. 16, 2008) (declining to reopen a suppression hearing as "it is clear that reopening the suppression hearing would be futile, and would not provide any justification for a modification of the Court's order suppressing" certain evidence).

The actual language of the Policy Manual does not contradict the testimony of Officers Torres and Evans that an unwritten discretionary policy existed regarding the safekeeping of cellphones. In relevant part, the Policy Manual dictates that: "The Officer will prepare a dated, itemized receipt, in duplicate, sign it and have the releasee and the witness sign it"; "The Officer will give one receipt to the releasee and will file a duplicate in the case/folder/record"; "The Officer will submit to the supervisor, as soon as possible, a report on the money or property taken"; and "The Officer will be responsible for the safe-keeping of the money and/or property." ECF 254-3. These procedures do not disprove the officers' proffered justification for seizing the Parole Cellphone, namely, a discretionary safekeeping policy. Indeed, the former relates to a clerical policy regarding the storage of items once seized, whereas the latter relates to a substantive policy regarding what items parole officers may seize in the first place. Judge Shields found the testimony of Officers Torres and Evans regarding the existence of a discretionary safekeeping policy to be credible, notwithstanding the absence of a written policy to that effect. In the Court's view, the fact that the Policy Manual contains a provision requiring certain recordkeeping procedures for items seized by parole officers does not change that conclusion.

Finally, the Defendant asserts that Officers Torres and Evans tailored their testimony to overcome constitutional objections, because: (1) "the cell phone seized by Parole . . . was not the one that was on record with the Parole Department as the Defendant's number . . . or was ever used to contact the Parole Officer"; and (2) "the Parole records of the Defendant which were not provided to the defense until after the hearing was completed and the prior motion decided," supposedly reflect that NYS Parole was acting in concert with other law enforcement agencies when the parole warrant was issued. ECF 276 at 4. The former argument was available to the Defendant at the time of the suppression hearing, and is collateral to the findings made by Judge Shields therein. The latter argument is based on an incorrect interpretation of the parole records. As the Government concedes, Detective Callahan made Officer Evans aware of the investigation into the Defendant on March 28, 2016. However, Detective Callahan's notes, which the Defendant relies on, makes no reference to the Parole Cellphone whatsoever and does not reference other law enforcement agencies until June 24, 2016, two weeks after the parole search. ECF 254-6.

Therefore, the Court denies the Defendant's motions regarding the testimony at the Parole Cellphone hearing.

### III.  CONCLUSION.

For the foregoing reasons, the Court denies the Defendant's motions in their entirety.


It is **SO ORDERED**:

Dated:  Central Islip, New York

 November 8, 2019

                    __/s/ Arthur D. Spatt_____
ARTHUR D. SPATT
United States District Judge
