UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X
UNITED STATES OF AMERICA,

       -against-                                OPINION & ORDER
                                                  16-CR-545 (SJF)(AYS)

TYRONE ROBINSON,

                        Defendant.
-------------------------------------------------------X
 FEUERSTEIN, J.

       Pending before the Court are the motions of defendant Tyrone Robinson ("Robinson" or

"defendant"): (i) for a judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal

Procedure ("Rule 29 Motion"); and (ii) for a new trial pursuant to Rule 33 of the Federal Rules

of Criminal Procedure ("Rule 33 Motion"). For the reasons set forth below, defendant's motions

are denied in their entirety.


I.       BACKGROUND

       On February 4, 2020, defendant was convicted, following a bifurcated jury trial, (A) of

twenty-two (22) felony offenses arising from his participation in seven (7) home invasion

robberies; and (B) of four (4) felony offenses arising from his unlawful possession of firearms

and ammunition.[1] *See* Docket Entry ("DE") [354]. Defendant now moves: (A) for a judgment of

acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure (i) as to counts nine (9),

eighteen (18) and twenty-four (24), each charging Unlawful Use of a Firearm under 18 U.S.C. §

924(c), on the basis that, as a matter of law, attempted Hobbs Act robbery, the predicate for each

of those charges, is not a qualifying "crime of violence" under that statute, and (ii) as to counts

---

[1] Defendant was acquitted of six (6) counts relating to two (2) additional home invasion robberies.

ten (10) through twelve (12), sixteen (16) through twenty-one (21), twenty-five (25) through

twenty-eight (28), and thirty (30) through thirty-two (32), on the basis that the evidence of his

involvement in certain home invasion robberies on September 18, 2015, January 13, 2016,

March 15, 2016 and May 3, 2016, and his unlawful possession of firearms and ammunition on

certain dates, *i.e.*, April 17, 2016, June 8, 2016 and between June 10, 2016 and July 8, 2016, was

legally insufficient to sustain the jury's verdict on those counts; and (B) for a new trial pursuant

to Rule 33 of the Federal Rules of Criminal Procedure on the grounds, *inter alia*, (i) that

defendant was denied due process of law and the effective assistance of counsel by the Court's

decision to limit the assistance of associate counsel, (ii) that defendant was denied due process of

law, the right to present a defense, the right to confront and cross-examine his accuser, and the

effective assistance of counsel by the Court's limitation on cross-examination of Varick Winters

("Winters"), a cooperating witness, and by the Court's charge during and after Winters's

testimony to disregard certain aspects of the cross-examination, (iii) that defendant was denied

the right to present a defense and the effective assistance of counsel by the Court's limitation on

trial counsel's summation, and (iv) that defendant was denied the effective assistance of counsel

by trial counsel's failure to pursue and obtain independent extractions from, and further analysis

of, certain cellphones and to pursue analysis of the IP addresses contained in Government

Exhibit 22b.[2]

---

[2] Defendant also filed a *pro se* supplemental brief on his Rule 33 motion, essentially seeking this Court's recusal pursuant to 28 U.S.C. § 455. *See* DE [404-1].

II.     DISCUSSION[3]

      A.     Rule 29 Motion

          1.     Standard of Review

Rule 29 of the Federal Rules of Criminal Procedure authorizes trial courts to "enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29. "A defendant challenging the sufficiency of the evidence bears a heavy burden because a reviewing court must consider the evidence in the light most favorable to the prosecution and uphold the conviction if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Bramer*, 956 F.3d 91, 96 (2d Cir. 2020); *see also United States v. Alcius*, 952 F.3d 83, 86 (2d Cir. 2020), *cert. denied*, 141 S. Ct. 296 (2020) ("A defendant bears a heavy burden because we view the evidence in the light most favorable to the government, drawing all inferences in the government's favor and deferring to the jury's assessments of the witnesses' credibility. . . . We will sustain the jury's verdict if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.") In other words, "a court may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *United States v. Temple*, 447 F.3d 130, 136 (2d Cir. 2006); *accord United States v. Cuti*, 720 F.3d 453, 461 (2d Cir. 2013).

"The jury may reach its verdict based upon inferences drawn from circumstantial evidence, and the evidence must be viewed in conjunction, not in isolation." *United States v. Pugh*, 945 F.3d 9, 19 (2d Cir. 2019); *see also United States v. Atilla*, 966 F.3d 118, 128 (2d Cir. 2020) ("We must analyze the evidence in conjunction, not in isolation, . . . and apply the

---

[3] Unless otherwise noted, case quotations omit all internal quotation marks, citations, footnotes, and alterations.

sufficiency test to the totality of the government's case and not to each element, as each fact may gain color from others."); *United States v. Cote*, 544 F.3d 88, 98 (2d Cir. 2008) ("[W]e consider the evidence in its totality, not in isolation, and the government need not negate every possible theory of innocence.") "A court will overturn a conviction [] only if, after viewing the evidence in the light most favorable to the Government and drawing all reasonable inferences in its favor, it determines that no rational trier of fact could have concluded that the Government met its burden of proof." *Pugh*, 945 F.3d at 19. "The reviewing court must defer to the jury's assessment of witness credibility and its assessment of the weight of the evidence." *Pugh*, 945 F.3d at 19; *see also Temple*, 447 F.3d at 136 ("In assessing the evidence, a court is constrained to bear in mind that Rule 29 does not provide it with an opportunity to substitute its own determination of [] the weight of the evidence and the reasonable inferences to be drawn for that of the jury.") "Where a court concludes after a full analysis of the evidence in connection with a Rule 29 motion that either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, [it] must let the jury decide the matter. . . . Conversely, in passing upon a motion for directed verdict of acquittal, [] if there is no evidence upon which a reasonable mind might fairly conclude guilt beyond a reasonable doubt, the motion must be granted." *Temple*, 447 F.3d at 137 *accord Cuti*, 720 F.3d at 461.

2.  Attempted Hobbs Act Robbery is a "Crime of Violence"

Initially, defendant renews his contention, expressly rejected by this Court, that attempted Hobbs Act robbery is not a "crime of violence" for purposes of 18 U.S.C. § 924(c). The Honorable Arthur D. Spatt, former United States District Judge, to whom this case was previously assigned, previously concluded that attempted Hobbs Act robbery constitutes a crime

of violence under § 924(c)'s elements clause and, thus, may sustain a § 924(c) charge[4]. *See United States v. Robinson*, No. 16-cr-545, 2019 WL 5864135, at *5 (E.D.N.Y. Nov. 8, 2019). As explained by Judge Spatt,

> "Placing such charges outside the reach of Section 924(c) would run afoul of the plain language of the statutes at issue, as well as analogous Second Circuit case law. The elements clause expressly includes the 'attempted use' or 'threatened use' of force within its definition of crime of violence. Therefore, if a completed Hobbs Act robbery involves the requisite use of force to qualify as a crime of violence, … then a necessary implication is that an attempt to commit the same crime constitutes an attempted use of force."

*Id.*

Defendant fails to provide any factual or legal basis for the Court to depart from Judge Spatt's prior ruling. The "categorical approach" adopted by the Supreme Court in *Mathis v. United States*, --- U.S. ---, 136 S. Ct. 2243, 2248, 195 L. Ed. 2d 604 (2016), to evaluate whether an offense constitutes a crime of violence, "involves two steps: first we identify the elements of the predicate conviction by determining the minimum criminal conduct a defendant must commit to be convicted; second, we determine whether that minimum criminal conduct 'has as an element the use, attempted use, or threatened use of physical force [against the person of another].'" *United States v. Moore*, 916 F.3d 231, 240 (2d Cir. 2019) (quoting U.S.S.G. § 4B1.2(a)(1)); *see also United States v. Samuels*, No. 18-cr-306, 2020 WL 5517772, at *5 (S.D.N.Y. Sept. 14, 2020) (holding that the categorical approach "requires the court to consider the minimum conduct necessary for a conviction of the predicate offense (in this case, an attempted Hobbs Act robbery), and then to consider whether such conduct amounts to a crime of violence under § 924(c)(3)(A).") "[T]he categorical approach is confined to the legal elements of

---

[4] Section 924(c) criminalizes carrying, brandishing or using a firearm during and in relation to, *inter alia*, any "crime of violence." The force or elements clause of 18 U.S.C. § 924(c)(3) defines the term "crime of violence" to mean "an offense that is a felony and-- (A) has as an element the use, attempted use, or threatened use of physical force against the person or property of another." *Id.* at § 924(c)(3)(A).

the statute, with no consideration of the facts of the underlying crime." *Moore*, 916 F.3d at 238; *see also United States v. Welch*, No. 17-cr-126, 20-cv-2835, 2020 WL 6200168, at * 2 (E.D.N.Y. Oct. 22, 2020) ("An offense categorically qualifies as a crime of violence if it has 'as an element the use, attempted use, or threatened use of physical force against the person or property of another,' regardless of whether physical force was actually used in a particular instance.")

Since the Second Circuit has yet to determine whether attempted Hobbs Act robbery qualifies as a crime of violence, the Court must apply the categorical approach to this crime. The Court agrees with the district courts in this Circuit, and other circuit courts, which have found that attempted Hobbs Act robbery constitutes a crime of violence under the force or elements clause of § 924(c)(3)(A). *See Samuels*, 2020 WL 5517772, at * 6 (citing cases). "The elements of the statute include 'attempted use' or 'threatened use' of physical force within the definition of crime of violence," *id.* (citing 18 U.S.C. § 924(c)(3)(A)), and "[i]f a completed Hobbs Act robbery requires an element of physical force to qualify as a crime of violence, then it must follow that an 'attempt' or 'threat' to commit the same crime would require an element of force as well." *Id.* Thus, "the minimum conduct necessary for an attempted Hobbs Act robbery amounts to a crime of violence." *Id.*; *see, e.g. United States v. Jeffreys*, No. 18-CR-359, 2019 WL 5103822, at *4-7 (E.D.N.Y. Oct. 11, 2019); *Simmons v. United States*, No. 16 Civ. 4797, 08-cr-1133, 2019 WL 6051443, at * 4 (S.D.N.Y. Nov. 15, 2019); *Crowder v. United States*, No. 16 CV 4403, 05-cr-67-02, 2019 WL 6170417, at * 2 (S.D.N.Y. Nov. 20, 2019). Accordingly, the branch of defendant's Rule 29 Motion seeking a judgment of acquittal on the basis that attempted Hobbs Act robbery is not a crime a violence under 18 U.S.C. § 924(c) is denied.

3.      Sufficiency of Evidence

Defendant next challenges the legal sufficiency of the evidence regarding his

participation in certain home invasion robberies, as well as his unlawful possession of firearms

and ammunition on certain dates.

a.      The Home Invasion Robberies

The Hobbs Act prohibits a person from "obstruct[ing], delay[ing], or affect[ing]

commerce or the movement of any article or commodity in commerce, by robbery . . . or

attempt[ing] or conspir[ing] so to do. . . ." 18 U.S.C. § 1951(a). The Act defines the term

"robbery" to mean "the unlawful taking or obtaining of personal property from the person or in

the presence of another, against his will, by means of actual or threatened force, or violence, or

fear of injury, immediate or future, to his person or property, or property in his custody or

possession, or the person or property of a relative or member of his family or of anyone in his

company at the time of the taking or obtaining." *Id.*, § 1951(b)(1).

Defendant claims that the evidence was legally insufficient to sustain the verdict as it

relates to: (i) the September 18, 2015 home invasion at 214 Poospatuck Lane in Mastic, New

York (the "Mastic Location") (Counts 10, 11 and 12) because "the evidence, viewed in the light

most favorable to the government, failed to establish beyond a reasonable doubt either that

defendant participated in committing the robbery or that the mere theft of money and/or drugs

was sufficient to prove the nexus to interstate commerce necessary to support Hobbs Act

jurisdiction," Affirmation of Murray E. Singer, Esq. in Support of Defendant's Rule 29 Motion

("Singer Rule 29 Aff."), ¶ 9; (ii) the January 13, 2016 home invasion at 22 Nostrand Place in

Hempstead, New York (the "Hempstead Location") (Counts 16, 17 and 18) because "the

7

evidence, viewed in the light most favorable to the government, failed to establish beyond a reasonable doubt either that defendant participated in the attempted robbery or that the mere attempted theft of money was sufficient to prove the nexus to interstate commerce necessary to support Hobbs Act jurisdiction," Singer Rule 29 Aff., ¶ 14; (iii) the March 15, 2016 home invasion at 129 Casino Street in Freeport, New York (the "Casino Street Location") (Counts 19, 20 and 21) because "the evidence, viewed in the light most favorable to the government, failed to establish beyond a reasonable doubt either that defendant participated in committing the robbery or that the mere theft of money and marijuana was sufficient to prove the nexus to interstate commerce necessary to support Hobbs Act jurisdiction," Singer Rule 29 Aff., ¶ 19; and (iv) the May 3, 2016 home invasion at 38 Frederick Avenue in Freeport, New York (the "Frederick Avenue Location") (Counts 25, 26, 27 and 28) because "the evidence, viewed in the light most favorable to the government, failed to establish beyond a reasonable doubt either that defendant participated in the robbery and murder or that the mere theft of money and marijuana was sufficient to prove the nexus to interstate commerce necessary to support Hobbs Act jurisdiction." Singer Rule 29 Aff., ¶ 24. In other words, as to each of those incidents, defendant principally argues: (i) that the motivation behind the robbery or attempted robbery and his participation therein were based on conjecture, *see* Singer Rule 29 Aff. ¶¶ 12, 14, 17, 22, 27; and (ii) that the mere theft of drugs or money, without more, is insufficient to confer federal jurisdiction under the Hobbs Act[5]. *See Id*. ¶¶ 13, 18, 23, 28. With respect to the former, defendant contends, *inter alia*, (i) that no one identified him as one of the robbers; (ii) that there was no physical evidence that he was present at or participated in those robberies or attempted

---

[5] With respect to the interstate nexus element, defendant specifically contends, *inter alia*, that the government's proof was insufficient to establish that defendant "knew the victim was selling drugs and was targeted as a result." Reply Affirmation of Murray E. Singer, Esq. in Further Support of Defendant's Rule 29 Motion ("Singer Rule 29 Reply"), ¶ 5.

robberies, or that the victims of those robberies were targeted because they were, or were believed to be, drug dealers; and (iii) that "[a]bsent an admission by defendant that he participated in th[at] robbery [or attempted robbery], any physical evidence placing him at the scene, or any identification of defendant as having been at the scene, defendant's participation in [the robbery or attempted robbery] and the motive behind the robbery [or attempted robbery] were based on mere conjecture." Singer Rule 29 Aff., ¶¶ 12, 17, 22, 27.

### i. Defendant's Motive

Contrary to defendant's contentions, the evidence at trial was legally sufficient to establish his motivation for committing the robberies and his *modus operandi* in carrying them out. Initially, the fact that each of the robbery victims was targeted because he or she was a drug dealer was established by, *inter alia*, the testimony of two (2) individuals with whom defendant planned and committed armed home invasions: Winters, who is also known as "Bravo," and Joshua Leader ("Leader"), who is also known as "Jooks."[6]

Winters testified that he and defendant became acquainted during their overlapping stays in a correctional facility, where defendant admitted that he made his money doing home invasions of drug dealers. (Tr. 76:3-5, 78:8-14.) Defendant specifically targeted drug dealers because he believed they kept cash and drugs close by. (Tr. 71:21-72:6, 79:10-13, 114:9-16.) Upon their release from custody, Winters and defendant planned and committed armed robberies of drug dealers together.[7] (Tr. 68:17-24, 71:19-20.)

---

[6] Defendant challenges the sufficiency of Winters's and Leader's testimony in this regard on the basis that their testimony concerned only three (3) of the incidents for which defendant was convicted, and contends that the evidence elicited as to each incident "simply does not support the prosecution's global claim" seeking to treat "proof for one as proof for all." Singer Rule 29 Reply, ¶ 4.

[7] Winters pled guilty to participating in the August 17, 2015 home invasion at 147 Smith Road in Lake Grove, for which defendant was also convicted, (Tr. 69:12-13, 74:5-75:4); and defendant does not challenge the legal

Leader similarly testified that he and defendant planned and committed armed robberies of drug dealers with the goal of stealing drugs (for resale) and drug proceeds. (Tr. 1138:16-22, 1139:3-10.) Like Winters, Leader testified that defendant specifically targeted drug dealers because those individuals were believed to have money and drugs in their houses and would be reluctant to call the police. (Tr. 1138:22-24, 1139:6-7.) Leader's testimony was broadly corroborated, including by a recorded phone call between him and defendant, in which, *inter alia*, (i) defendant described the December 17, 2015 home invasion of 19 Woodbine Avenue in Bay Shore,[8] (GX 410); (ii) Leader indicated that the victim, Jessica Gonzales ("Gonzales"), was allegedly making money as a drug dealer, (Tr. 1224:2-9); (iii) defendant acknowledged that he found "weed," *i.e.,* marijuana, and "ingredients," *i.e.*, drug paraphernalia, in Gonzales' house, but that the robbery was ultimately a "dub," meaning that it was unsuccessful, (Tr. 1221:14-22, 1222:24-1223:1, 1226:16-22); (iv) defendant described how, in the presence of Gonzales's minor son, he beat Gonzales with a gun in an effort to learn the location of drugs or money, (Tr. 1222:16-21, 1225:24-1226:2, 1229:7-16); and (v) defendant told Leader he was "on the hunt," or actively seeking out drug dealers he could target for armed home invasions. (Tr. 1230:24-1231:5.)

Both Winters and Leader also testified about defendant's planning and execution of the robberies. For example, Winters testified that defendant staked out the locations of potential

---

sufficiency of the evidence establishing his involvement in that crime. Defendant asserts that he does not challenge the legal sufficiency of the evidence establishing his involvement in the August 17, 2015 home invasion, or in two (2) other home invasions on December 17, 2015 and March 25, 2016, because "[t]here was direct testimony from cooperating witnesses Varick Winters and Joshua Leader that they had conspired with Mr. Robinson and participated in these incidents with Mr. Robinson, and it was for the jury to determine whether that testimony was to be believed." Singer Rule 29 Reply, ¶ 3. According to defendant, [b]y contrast, neither Mr. Winters nor Mr. Leader provided direct testimony of Mr. Robinson's involvement in the challenged incidents." (*Id.*)

[8] As noted above, defendant does not challenge the legal sufficiency of the evidence establishing his involvement in the December 17, 2015 home invasion.

home invasions, which was corroborated by text messages in which defendant asked Winters for directions to the location of a planned robbery days before carrying it out. (Tr. 79:16-25, 80:12-14; GX 45I.) Winters also testified, *inter alia*, that defendant wore dark clothing and gloves to his robberies; that he would surprise his victims entering or exiting the house; that he would immediately pistol-whip the victims and bind their hands and feet with zip ties; and that while he was inside the house, he interrogated his victims about the location of drugs and money while he pistol-whipped them and sometimes threatened them with a hot iron. (Tr. 79:3-4, 80:8-11, 80:1-4, 113:14-19, 115:2-7.)

Leader testified that he staked out potential robbery targets with defendant and that defendant would research the drug dealers on social media. (Tr. 1146:12-1147:15, 1155:2-6, 1155:12-18.) Like Winters, Leader: (i) testified that defendant used zip ties, gloves, masks and guns in the commission of such crimes, and would try to surprise his victims on their way in or out of the house; (ii) described how defendant laid his victims on the floor, restrained their limbs and pistol-whipped them; and (iii) recalled defendant threatening victims with a hot iron. (Tr. 1155:23-25, 1158:5-24, 1174:10-22, 1178:16-23, 1209:20-1210:1.) In fact, prior to executing a robbery with defendant in 2014, Leader and defendant went to Home Depot together to purchase disposable gloves and zip ties. (Tr. 1200:6-23.) Leader also testified: (i) that prior to entering a home, defendant "looped" the zip ties so that they were partially zipped, (Tr. 1157:5-10); (ii) that during robberies, defendant searched for drugs and money in shoeboxes, bedding, couch cushions, closets and kitchen cabinets, (Tr. 1159:18-25, 1160:3-12); and (iii) that if the initial robbery was unsuccessful, defendant often returned within a day or two to finish the job. (Tr. 1160:13-1161:7, 1203:11-16.)

11

Against this backdrop, the jury heard evidence clearly connecting defendant to each of the home invasion robberies at issue.

A.      Home Invasion at the Mastic Location

Following their release from prison, Winters and defendant scouted the Mastic Location for a home invasion robbery, (Tr. 128:3-17, 133:5-134:17; GX 306-A), which, according to Winters, was specifically targeted because one of the occupants was a known drug dealer and defendant believed he would have large sums of money in the house. (Tr. 134:19-23.) Cellular location data showed that defendant staked out the Mastic Location on August 31 and September 16, 2015[9]. (Tr. 2252:21-2253:8, 2253:15-2254:8; GX 28A, GX 28B.) Then, on the evening of September 18, 2015, defendant left his residence in Bay Shore and arrived near the Mastic Location at approximately 8:50 p.m. (Tr. 2255:11-2256:1; GX 28D.)

Approximately two (2) hours later, Dakirah Harris ("Harris") was awakened inside the house by masked men with guns, who ordered her onto the floor and bound her hands and feet with zip ties. (Tr. 1018:18-1019:18, 1019:23-1020:12.) Harris's boyfriend, Rodney Terry ("Terry"), exited the bathroom to find three (3) masked individuals inside the house. (Tr. 1059:19-1060:3, 1062:7-10.) One of the individuals, who he described as short and stocky, (Tr. 1061:13-21), pistol-whipped Terry to the kitchen floor, zip-tied his hands behind his back and began asking where "everything" was hidden. (Tr. 1060:6-1061:9.) Terry was a heroin dealer and understood the term "everything" to mean drugs and money. (Tr. 1058:15-24, 1062:2-6.)

---

[9] Defendant contends that Winters's testimony and the cell-site information "at best established [defendant's] knowledge of the event and presence near the scene." Singer Rule 29 Aff., ¶ 12.

During the interrogation, Terry's assailant pistol-whipped him repeatedly, including one blow that caused the gun to discharge,[10] (Tr. 1060:12-14); and moved Terry from the kitchen to the bedroom, from the bedroom to the living room, and from the living room to the basement. (Tr. 1062:18-20.) During that time, Harris observed Terry zip-tied and beaten, being dragged about the house, and being questioned about the contents of a safe. (Tr. 1021:1-13, 1022:14-15.) The men also questioned Harris about the whereabouts of Terry's money and pistol-whipped her in the face, breaking her teeth. (Tr. 1020:15-25, 1021:21-1022:7.) One of the robbers even demanded an iron. (Tr. 1023:13-16.) Harris also heard one of the intruders refer to another as "Ty."[11] (Tr. 1022:19-22.)

Consistent with the cell-site evidence showing that defendant cased the Mastic Location since August 31, 2015, one of the men told Harris they had been watching the house for two (2) weeks. (Tr. 1023:16-20.) There was also evidence showing that the intruders "ransacked" the Mastic Location, *e.g.*, they overturned mattresses and emptied shoeboxes, dresser drawers and kitchen cabinets, (Tr. 849:15-17; GX 305); and that Terry's cousin, Terrance Sinclair ("Sinclair"), eventually entered the home and was immediately pistol-whipped several times, causing him to lose consciousness. (Tr. 1046:16-20.) When Sinclair awoke, he was zip-tied in the basement next to Terry, (Tr. 1046:23, 1048:21-25, 1049:12-14); and Terry's assailant directed him to open two (2) safes and continued to beat him when he did not provide the combination. (Tr. 1067:19-1068:25, 1070:11-14, 1070:15-18.) After the assailant pointed his gun at Sinclair and threatened to shoot if Terry did not forfeit his drugs and money, Terry complied

---

[10] A cartridge casing was found next to a pool of blood on the kitchen floor, indicating that a gun had been fired. (Tr. 864:1-19; GX 332.) The bullet was recovered from the ceiling in an adjoining room. (Tr. 885:20-887:12; GX 331.)

[11] Leader testified that he referred to defendant as "Ty," and he did so throughout his direct testimony. (Tr. 1140:24-1141:3, 1176:7, 1197:22, 1200:15, 1204:6, 1215:7, 1218:12; 1225:22.) Winters also referred to defendant as "Ty," (Tr. 112:25-113:3, 129:13); and a text message in defendant's phone confirmed that others, including Khadija Muhammad, also called him "Ty." (Tr. 571:20-24.)

and directed the assailant to a duffel bag containing $40,000 or $50,000 in drug proceeds and five hundred (500) grams of heroin. (Tr. 1071:9-22, 1072:16-24, 1073:10-21.) Defendant left the Mastic Location at around midnight and returned to his Bay Shore residence around 2:00 a.m. (Tr. 2257:11-19; GX 28K.)

After he heard about the robbery on the news, Winters contacted defendant, who told him that "it was a good one" and "a good hit," which Winters understood to mean that defendant had stolen large amounts of money and jewelry. (Tr. 135:24-136:5, 136:4-19, 137:7.)

### B.      Home Invasion at the Hempstead Location

Several months later, defendant began staking out the Hempstead Location, visiting the premises on January 8, January 11 and January 12, 2016. (Tr. 2259:18-24, 2260:18-2261:1, 2261:9-14; GX 29A, GX 28B, GX 28C). On the evening of January 13, 2016, defendant left his residence in Bay Shore and arrived near the Hempstead Location around 8:45 p.m., where he remained for several hours. (Tr. 2262:22-2263:5; GX 29D.) At approximately 10:05 p.m., defendant's cellphone ceased all activity[12]. (Tr. 2266:1-17; GX 29H, GX 29I.)

Around the same time, Nehemiah Garrett ("Nehemiah") returned home to the Hempstead Location with his brother Demetrius Garrett ("Demetrius"). (Tr. 1424:1-7, 1565:12-19.) Nehemiah was a cocaine dealer who was selling drugs to Darryl Troutman ("Troutman"), also known as "Suggz," around the time of the robbery. (Tr. 1427:17-18, 1428:13-149:3, 2272:2-12.) Unbeknownst to Nehemiah, Troutman was an associate of defendant. (GX 44X.)

Upon exiting their car and proceeding toward the entrance of the house, the Garrett brothers were attacked in a narrow alleyway by masked men with guns. (Tr. 1425:5-9, 1426:6-8,

---

[12] Defendant again contends that the cell-site information "at best established [his] knowledge of the event and presence near the scene." Singer Rule 29 Aff., ¶ 17.

1579:20-22.) Demetrius was ordered to the ground at gunpoint, where one of the men stepped on his head, pressed the gun to his back and searched his pants pockets. (Tr. 1568:9-21, 1572:1218.) The other assailant demanded that Nehemiah let them into the house. (Tr. 1426:9-12, 1427:13-18.) When Nehemiah resisted, the men restrained him with zip ties, leaned him up against the side of the house and beat him unconscious. (Tr. 1427:3-6, 1573:3-4, 1574:12-13.) Nehemiah suffered life-threatening injuries during the attack. (Tr. 1429:14-1430:1; GX 502.)

When Nehemiah's neighbors came to investigate the commotion, the assailants fired a gunshot as they fled without having successfully stolen anything. (Tr. 1380:19-24, 1573:4-8; GX 530.) At approximately 10:36 p.m., defendant's cellphone resumed activity as it traveled from the Hempstead Location and arrived near defendant's home around 11:00 p.m. (Tr. 2265:15-21; GX 29J.) Between 1:02 a.m. and 1:12 a.m., defendant surveyed breaking news coverage of the attempted home invasion and searched the internet for "robbery in hempstead ny," "Hempstead crime news" and "man beaten in hempstead." (GX 23I, 22DD at Entries 2705-2714.)

Consistent with Leader's testimony that defendant returned to the scenes of unsuccessful robberies, and defendant's *modus operandi* generally, the following day, *i.e.*, January 14, 2015, defendant searched for directions to the Hempstead Location.[13] (GX 22DD, Entries 2737-2738.) Shortly thereafter, defendant also searched for directions to Troutman's house. (Tr. 2269:8-2271:5; GX 22DD, Entry 2736.)

## C.     Home Invasion at Casino Street Location

Consistent with Leader's testimony that defendant researched his targets on social media, about a month later, on February 29, 2016, Troutman sent defendant a screenshot of the

---

[13] Specifically, defendant searched for "Directions to Albermarle Ave, Hempstead, NY." The Hempstead Location sits at the corner of Albermarle Avenue and Nostrand Place. (Tr. 1391:7-11; GX 510.)

Facebook page of Malik Burton ("Burton"), also known as "Big Casino," (Tr. 1479:1-8, 1479:19-24, 1494:9-17, 1739:11-21; GX 22EE, Entry 776, GX 26D), who was a drug dealer. (Tr. 1486:7-14, 1490:22-24, 1493:15-22; GX 654, 655.) On March 13, 2016, defendant searched for directions to Burton's home at 129 Casino Street, *i.e.*, the Casino Street Location, and, later that day, staked out that location. (Tr. 1740:6-14, 2273:1-25; GX 22EE, Entries 1629-1631, GX 30A.)

The following day, defendant visited the Home Depot store located at 1881 Sunrise Highway in Bay Shore. (Tr. 2276:3-9; GX 30B, GX 30C, GX 30D.) Indeed, at 8:01 p.m., defendant's cellphone interacted with a nearby cell tower. (Tr. 2278:24-2279:8; GX 30H.) Minutes later, at 8:05 p.m., a transaction receipt was generated for the purchase of black heavy-duty disposable gloves and a package of zip ties. (Tr. 1539:1-13; GX 652, 653, 1430.) Two (2) minutes later, interior surveillance cameras captured defendant, wearing a green Champion hooded sweatshirt, exiting the store with those items. (Tr. 1714:9-14; GX 650C.) Three (3) minutes later, as defendant placed a call to Troutman, his cellphone again interacted with a nearby cell tower. (Tr. 2279:10-2280:3, 2280:12-21; GX 30I.) Defendant then traveled to Troutman's residence, where he remained until approximately 9:45 p.m. (Tr. 2274:16-2275:6; GX 30B.)

Later that evening, Eugenie Baptiste ("Baptiste") fell asleep in her living room at the Casino Street Location. (Tr. 1467:3-4.) At around midnight, her son Khalid knocked at the back door; when Baptiste opened it, Khalid was pushed inside by two (2) armed intruders dressed in dark clothing and masks. (Tr. 1451:22-1452:18; 1453:18-19; 1453:9-13; 1455:08-25; 1467:5-7, 1468:13-24.) The men ordered Baptiste onto the floor and threatened to kill her, then began demanding money. (Tr. 1457:23-1458:2, 1467:9-12, 1806:3-4.)

16

Baptiste called for her other son, Burton, who was asleep in his upstairs bedroom with Khatora Watson ("Watson"). (Tr. 1469:13-16, 1480:21-1481:3.) When Burton came downstairs and attempted to fight off the intruders, one of them shot him in the leg. (Tr. 1458:20-23, 1469:17-24, 1481:22-25, 1483:19-24, 1803:20-22.) Watson was ordered upstairs at gunpoint, where her assailant searched Burton's room and stole money and a backpack containing marijuana before fleeing. (Tr. 1804:1-1805:20, 1806:20-1807:1.) Nassau County police officers later found emptied shoeboxes and other evidence that the house had been searched. (Tr. 1410:7-11.) Police also found zip ties that had been "looped" or partially zipped prior to the robbery, which was consistent with Leader's testimony. (Tr. 1408:11-18; GX 600.)

During the course of this encounter, *i.e.*, from 10:25 p.m. to 1:53 a.m., defendant was in the vicinity of the crime scene. (Tr. 2276:10-17; GX 30E.) Following the robbery, defendant left the Casino Street Location and arrived near his Bay Shore residence around 4:30 a.m. (Tr. 2276:19-25; GX 30F.) By 5:45 a.m., defendant was searching the internet for "home invasion in Freeport ny" to view breaking news coverage of the robbery. (GX 22DD, Entries 1579-1580, GX 23D.) Meanwhile, Burton sought treatment at Southside Community Hospital, where operating room staff extracted the bullet from his leg and turned it over to police. (Tr. 1470:1-2, 1812:13-1913:2; GX 625.)

On June 8, 2016, Loretta Roth ("Roth") was gardening her property a short distance from defendant's residence, when she found a gun hidden in her bushes[14]. (Tr. 918:3-15, 919:21-25; GX 1102.) The weapon was a Rossi .357 Magnum revolver with one (1) expended casing in the

---

[14]   Defendant contends that "[t]he cell site information, the internet searches before and after the incident, the photograph of Mr. Burton, and the proximity of the gun used to shoot Mr. Burton to defendant's home, even taken together, at best established knowledge of the event and presence near the scene." Singer Rule 29 Aff., ¶ 22.

chamber. (Tr. 945:22-947:15; GX 1110.) Ballistics analysis confirmed that this was the gun used to shoot Burton on March 14, 2016. (Tr. 1943:20-1944:5.)

> D.      Home Invasion at Frederick Avenue Location

Several months later, from April 1, 2016 to May 2, 2016, defendant staked out the home at the Frederick Avenue Location nearly every day. (*See* Tr. 2291:14-19, 2292:13-2293:18, 2297:2-19, 2298:2-2299:13, 2299:24-2300:12, 2302:20-2303:5; GX 32A-32GG). During one visit on April 25, 2016, defendant was pulled over in a white Hyundai sedan, bearing license plate number HWB611, which is registered to his sister.[15] (Tr. 1619:5-20, 1624:3-1625:9; GX 51, GX 1077.) Moreover, on April 28, 2016, defendant made several searches on the internet for "house diagram on frederick st freeport new York" and "38 frederick st freeport ny," as well as numerous searches for purveyors of residential floor plans. (Tr. 631:25-633:22; GX 22DD, Entries 855-866 & 872-904.) Using the alias "Mike Smith," defendant inquired about obtaining floor plans for the Frederick Avenue Location, (Tr. 314:22-315:23, 618:7-623:15; GX 22H, GX 22I, GX 22J), but he paid for those records with his personal debit card. (Tr. 2383:20-2384:8; GX 10E, GX 25.)

At three (3) different times on May 1, 2016, defendant drove his sister's white Hyundai to case the Frederick Avenue Location. (Tr. 2300:13-20, 2301:2-2302:10; GX 1017A.) The following day, on May 2, 2016, he visited the location again, at which time a nearby residential surveillance system captured the car parking along the sidewalk and two (2) men exiting the

---

[15] License Plate Readers ("LPRs") in and around the Village of Freeport captured that vehicle in Freeport on April 5, 2016 (Tr. 2294:3-10; GX 1009); April 10, 2016 (Tr. 2297:20-2298:1); April 18, 2016 (Tr. 2298:14-15); April 22, 2016 (Tr. 2299:3-4); April 26, 2016 through April 28, 2016 (Tr. 2299:14-17); May 1, 2016; and May 2, 2016.

vehicle, approaching the Frederick Avenue Location, and then returning to the car and leaving. (Tr. 2303:11-20; 2304:19-2305:3; GX 32HH.)

On May 3, 2016, LPRs captured defendant driving his sister's white Hyundai into Freeport at 9:20 a.m. (Tr. 1613:20-1614:1; GX 1009, GX 1011.) Defendant's movements thereafter were detailed in a compilation of chronological footage from various public and private surveillance cameras in the area. (Tr. 1962:7-1963:2; GX 1014.) Beginning at approximately 9:24 a.m., defendant drove the white Hyundai through Freeport, traveling down Frederick Avenue, onto Parsons Avenue and ultimately arriving on Commercial Street, where he parked at approximately 9:27 a.m. Accompanied by a second man, defendant exited the vehicle in the same green Champion hooded sweatshirt he wore to purchase zip ties and rubber gloves on March 14, 2016, and which law enforcement officers later recovered from his apartment. The two (2) men walked through Northeast Park toward Frederick Avenue, arriving in the vicinity of the Frederick Avenue Location by 9:36 a.m.

That morning, Rori Johnson Burke ("Burke"), who was a marijuana dealer, drove to JFK airport in a rented grey Dodge Dart to pick up his friend Jonathan Isaac ("Isaac"). (Tr. 1772:14-22, 1774:10-12; GX 1000 at 31.) The pair traveled eastbound from the airport toward Roosevelt, where they stopped to pick up three (3) or four (4) pounds of marijuana, (Tr. 1774:2-6), then they drove to the Frederick Avenue Location, where Burke exited the vehicle with the marijuana and went inside, while Isaac waited in the rental car. (Tr. 1774:19-25, 1775:1-2.) Upon entering the house, Burke was attacked by two (2) armed intruders, who ordered him onto the floor, used zip ties to restrain him, and began beating him with a gun. (Tr. 1775:6-8, 1777:2-4, 1777:18-1778:11.) When asked who was in the car, Burke falsely stated that Isaac was his young nephew, hoping that they would leave Isaac alone. (Tr. 1781:11-20.)

19

The intruders dragged Burke into the basement, where they interrogated him about the location of drugs and money and shot him twice after he denied having any hidden stash. (Tr. 1778:19-1779:8, 1779:19-1780:8, 1780:10-12.) Eventually, the intruders brought Isaac into the house; and, from the basement, Burke could hear him pleading with the men and telling them he had children. (Tr. 1781:21-1782:3.) Burke then heard a gunshot and the intruders dragged an injured Isaac, also zip-tied, down the basement steps. (Tr. 1782:4-7, 1782:20-25, 1783:1-3.) Shortly after 11:30 a.m., Burke's neighbor reported hearing someone pleading for their life inside the Frederick Avenue Location and three (3) gunshots. (Tr. 1501:7-1502:13; GX 1013.) After the intruders left, Isaac freed himself, went upstairs and returned with a tool to cut Burke free, then called 911. (Tr. 1598:4-5, 1783:15-23; GX 1012.)

Responding investigators observed that the intruders had apparently fled in Burke's rental car. (Tr. 1600:8-14.) Compiled surveillance footage showed that at approximately 11:38 a.m., the grey Dodge Dart traveled back through Freeport toward the location of defendant's sister's white Hyundai on Commercial Street. At approximately 11:39 a.m., defendant and his accomplice exited the stolen vehicle, removed objects from the trunk and fled the area in the white Hyundai. At 12:35 p.m., defendant placed his first phone call after the robbery to Troutman. (Tr. 2309:11-24; GX 32KK.)

Meanwhile, at 12:25 p.m., Isaac arrived at Nassau County Medical Center, where trauma surgeon Lambros Angus, M.D. unsuccessfully attempted to stem the internal bleeding caused by a gunshot wound to his lower abdomen. (Tr. 2011:23, 2012:6-24, 2014:2-18.) Thirty-seven (37) minutes later, Isaac died on the operating table. (Tr. 2014:22-5, 2015:6-13.) A post-mortem examination revealed that the cause of death was a transected artery caused by the assailant's bullet. (Tr. 2015:21-25; 2017:7-9; 2018:1-10.)

20

Later that afternoon, defendant searched the internet for "breaking news freeport ny home invasion" and viewed related news coverage. (GX 22DD, Entries 727-734.) At approximately 4:43 p.m., defendant exchanged text messages with Troutman, in which he stated, "that shit a dub," which was a phrase he previously used when discussing a robbery with Leader. (Tr. 1221:14-22, 1743:22-1745:22; GX 1205D.) Following a brief telephone call, defendant instructed Troutman to "never talk about it."

The following day, police officers conducted surveillance of defendant's Bay Shore residence, where they observed defendant exit his home and drive away in his sister's white Hyundai sedan. (Tr. 1616:3-1617-8; GX 1006.) Later that day, defendant searched the internet for "freeport two shot" and again viewed related news coverage of the home invasion[16]. (Tr. 624:3-625:626:1, 630:2-14; GX 22DD, Entries 704-705 & 722-726, GX 23A, GX 23E.)

Police also located an expended .45-caliber shell casing in the basement of the Frederick Avenue Location. (Tr. 2393:6-14; GX 1050.) Ballistics analysis confirmed that the bullet was fired from the same gun used in the December 17, 2015 home invasion at 19 Woodbine Avenue in Bay Shore.[17] (Tr. 2119:18-20, 2121:6-17, 2132:13-2133:16, 2134:21-23; GX 433, GX 1050.) Specifically, the firearm used in both incidents was likely a .45-caliber semiautomatic handgun manufactured by Hi-Point, which was the same type of weapon defendant's friend and gun supplier Bradley Cooke ("Cooke") sold him. (Tr. 967:1-968:15, 988:7-989:2, 2140:25-2141:4.)

---

[16] Once again, defendant contends that "[t]he cell site information, the internet searches before and after the incident, and the connection to and occasional use of his sister's car, even taken together, at best established knowledge of the event and presence near the scene." Singer Rule 29 Aff., ¶ 27.

[17] As noted above, defendant does not challenge the sufficiency of the evidence establishing his involvement in the Bay Shore home invasion.

21

Thus, construed in its totality and in the light most favorable to the government, the jury reasonably concluded that the evidence established defendant's participation in the home invasion robberies, and his motive for doing so, beyond a reasonable doubt.

ii.     The Interstate Nexus

The evidence also established federal jurisdiction beyond a reasonable doubt. The Hobbs Act defines "commerce" to mean "commerce within the District of Columbia, or any Territory or Possession of the United States; all commerce between any point in a State, Territory, Possession, or the District of Columbia and any point outside thereof; all commerce between points within the same State through any place outside such State; and all other commerce over which the United States has jurisdiction." 18 U.S.C. § 1951(b)(3).

The United States Supreme Court has unambiguously held:

> "In order to obtain a conviction under the Hobbs Act for the robbery or attempted robbery of a drug dealer, the Government need not show that the drugs that a defendant stole or attempted to steal either traveled or were destined for transport across state lines. Rather, to satisfy the Act's commerce element, it is enough that a defendant knowingly stole or attempted to steal drugs or drug proceeds, for, as a matter of law, the market for illegal drugs is 'commerce over which the United States has jurisdiction.' And it makes no difference under our cases that any actual or threatened effect on commerce in a particular case is minimal."

*Taylor v. United States*, --- U.S. ---, 136 S. Ct. 2074, 2081, 195 L. Ed. 2d 456 (2016). Therefore, "if the Government proves beyond a reasonable doubt that a robber targeted a [drug] dealer's drugs or illegal proceeds, the Government has proved beyond a reasonable doubt that commerce over which the United States has jurisdiction was affected." *Id.* at 2080-81. The jury was so instructed, without any objection from the defense. (Tr. 2521:15-24.)

As set forth above, when viewed in the light most favorable to the government, the evidence at trial was sufficient to permit the jury to reasonably infer that each of the victims of

22

defendant's home invasions was targeted specifically because he or she was a drug dealer. The evidence established, *inter alia*, that, in carrying out the robberies, defendant interrogated his victims as to the whereabouts of their drug stashes and searched areas of the homes where drugs and drug proceeds were likely to be kept[18], and, thus, was legally sufficient to establish the interstate commerce element of the Hobbs Act. Accordingly, the branches of defendant's Rule 29 Motion challenging the sufficiency of the evidence with respect to the home invasion robberies on September 18, 2015, January 13, 2016, March 15, 2016 and May 3, 2016 are denied in their entirety.

### b.   The Felon-in-Possession Counts

Defendant's contention that the evidence is insufficient to sustain the jury's verdict as to Counts 30 through 32, all of which charged him, as a previously convicted felon, with possessing firearms and ammunition, is without merit.[19] Specifically, defendant contends, *inter alia*, that absent any evidence of his possession of the firearms and ammunition, "the evidence, even viewed in the light most favorable to the government, was insufficient to establish [his] guilt" of those counts. Singer Rule 29 Aff., ¶¶ 30, 32, 34.

Section 922(g) of title 18 of the United States Code provides, *inter alia*, "It shall be unlawful for any person-- (1) who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year . . . to ship or transport in interstate or foreign

---

[18] Defendant's contention that since "[d]rugs and drug proceeds are no different than any other valuables in a home[,] [t]he search of any area of a home where valuables may be kept does not give rise to an inference that the search was specifically for drugs or drug proceeds," Singer Rule 29 Reply, ¶ 6, is without merit. The evidence, when viewed in its entirety in a light most favorable to the government, is sufficient to establish that defendant knew that each of the victims was selling drugs and was targeted as a result thereof.

[19] Defendant does not challenge the sufficiency of the evidence establishing his possession of a Hi-Point .40-caliber semi-automatic pistol and ammunition on or about September 5, 2015 (Count 29).

commerce, or possess in or affecting commerce, any firearm or ammunition. . . ." 18 U.S.C. § 922(g).

i.      Possession of Firearms and Ammunition on April 17, 2016

Count thirty (30) charged defendant with possessing several weapons on April 17, 2016, *i.e.*, a Smith & Wesson .32 caliber revolver, a Jimenez Arms 9 mm pistol, and an Intratec .22 caliber pistol, and ammunition, which were recovered from a safe on the roof of the home where defendant rented the second floor. However, defendant contends, *inter alia*, that no physical evidence connected him to either the safe or any of the guns; there was no testimony that he purchased or was given any of those guns from anyone; and the only evidence connecting him to the safe and those guns "was their presence on the roof of a home where defendant rented the second floor, but which was owned by persons living on the first floor of the house." Singer Rule 29 Aff., ¶ 29.

At all relevant times, defendant lived in the second-floor apartment of the home located at 1087 Martinstein Avenue in Bay Shore, which he rented from Frank Ocello ("Ocello"). (Tr. 905:1-14.) The windows of defendant's apartment provided access to a split-level roof. (GX 900.) On April 17, 2016, with defendant's consent, Ocello entered the apartment to adjust the thermostat, at which time he noticed that the screen for one of defendant's windows had been removed. (Tr. 910:16-911:5.) Ocello walked out onto the split-level roof and discovered a bag tucked behind the chimney. (Tr. 911:8-16.) Inside the bag was a safe, (Tr. 913:2-24), and inside the safe were guns and ammunition, (Tr. 914:4-6), including a silver Jimenez Arms 9mm-caliber

24

semiautomatic pistol (GX 934); an Intratec .22-caliber pistol (GX 932); and a box of .45-caliber PMC brand ammunition[20]. (GX 926).

About a week before Ocello found those items on the roof, defendant exchanged text messages with Troutman, in which Troutman stated that he "keep[s] losing straps." (GX 1205C.) "Strap" is a slang term for a gun. (Tr. 1731:15-16.) Defendant responded that his "straps" had "been outside in t[h]is weather." (GX 1205C.) Moreover, during their direct testimony, both Winters and Leader identified the silver Jimenez Arms pistol as being consistent with one of the firearms defendant supplied in connection with the April 17, 2015 home invasion robbery they committed at 147 Smith Road in Lake Grove.[21] (Tr. 93:14-95:14, 1169:8-24.) Finally, Cooke identified the box of .40-caliber PMC brand ammunition as one that he purchased from a pawn shop in Georgia and sold to defendant. (Tr. 989:12-990:5.) Accordingly, the jury could reasonably conclude that defendant possessed those items on the date in question.[22]

---

[20] The safe also contained a Smith & Wesson .32-caliber revolver and a quantity of loose ammunition of various types and sizes. (Tr. 943:13-25; GX 927-930, 936.)

[21] Winters and Leader testified that defendant supplied two (2) guns for the April 17, 2015 robbery—one silver and one black; and they identified the Jimenez Arms 9mm caliber pistol that was recovered from defendant's roof as being consistent with the silver gun, and a black Hi-Point .40-caliber semi-automatic pistol that was recovered from the bushes outside defendant's house on September 5, 2015 as being consistent with the black gun. (Tr. 89:20-91:12, 1168:14-1169:7; GX 200A.) As previously noted, defendant does not contest the sufficiency of the evidence establishing that he committed the April 17, 2015 home invasion with Winters and Leader; nor does he contest his possession of the black Hi-Point .40-caliber pistol. Indeed, that gun's serial number was shown to match the serial number of a gun that Cooke purchased in Georgia and sold to defendant. (Tr. 972:3-973:8.)

[22] To the extent defendant contends that evidence of physical possession of the firearms was necessary to establish those offenses, *see, e.g.*, Singer Aff. ¶¶ 29, 31, 33 (arguing, *inter alia*, that no physical evidence linked defendant to the firearms), the jury was properly instructed that possession "does not necessarily mean that the defendant must hold it physically, that is, have actual possession of it. As long as the firearm is within the defendant's control, he possesses it. If you find that the defendant either had actual possession of the firearm, or that he had the power and intention to exercise control over it, even though it was not in his physical possession, you may find that the government has [met its burden of proof]." (Tr. 2607:22-2608:7.)

ii.   Possession of a Firearm and Ammunition on June 8, 2016

Count thirty-one (31) charged defendant with possessing a firearm on June 8, 2016, *i.e.*, a Rossi .357 caliber revolver that had been used to shoot Burton, which was recovered from the hedge of a home near defendant's home. According to defendant, no physical evidence of any kind connected him to that gun; there was no testimony that he purchased or was given that gun from anyone; and his only connection to that gun "was his purported participation in the robbery on March 15, 2016 for which, as has been detailed above, was not established by the evidence." Singer Rule 29 Aff., ¶ 31.

As set forth above, on June 8, 2016, Roth discovered in her bushes the same Rossi .357 Magnum revolver that was used to shoot Burton during the March 14, 2016 home invasion at the Casino Street Location. Since the evidence was legally sufficient to conclude that defendant committed that robbery, the jury could also reasonably conclude that defendant subsequently hid the gun used to shoot Burton on Roth's nearby property.


iii.   Possession of Ammunition between June 10 and July 8, 2016

County thirty-two (32) charged defendant with possessing one round of .22 caliber ammunition in his home sometime between June 10, 2016 and July 8, 2016. According to defendant, he was arrested at his home on June 10, 2016, and had been in custody since that time, (Tr. 1641); his home was searched pursuant to a search warrant one (1) month later, *i.e.*, on July 8, 2016, at which time the round of ammunition was recovered, (Tr.. 1530, 1534); and "[t]here was no evidence that no one else had access to this home in the interim." Singer Rule 29 Aff., ¶ 33. In addition, defendant contends that "there was no physical evidence connecting defendant to the round of ammunition." *Id.*

On July 8, 2016, law enforcement officers executed a judicially-authorized search warrant at defendant's apartment, where they located numerous items of evidence, including a .22-caliber cartridge, which formed the basis for a felon-in-possession charge. (Tr. 1530: 20-23, 1534:7-22; GX 1434.) In addition to the fact that this item was located inside defendant's residence, there was ample evidence to conclude that the ammunition belonged to him. Initially, defendant's access to a firearm capable of firing the cartridge was demonstrated by the .22-caliber pistol found on his roof just three (3) months earlier, as set forth above. Furthermore, the cartridge was found amongst numerous items of personal property and other evidence that was clearly connected to defendant. For example, investigators found the Home Depot receipt reflecting defendant's purchase of zip ties and gloves hours before the home invasion robbery at the Casino Street Location in the same white plastic bag as the bullet. (Tr. 1539:3-13, 1540:13-1541:17; GX 1430.) They also found a rental car agreement bearing the name of Khadijah Muhammad, who testified that, at defendant's request, she rented a car that was later used in connection with a home invasion robbery. (Tr. 1537:3-16.)

In addition, investigators located the green Champion hooded sweatshirt that defendant wore to purchase gloves and zip ties prior to the home invasions at the Casino Street Location and the Frederick Avenue Location. (Tr. 1544:2-1545:14; GX 1433.) Also found alongside the .22 caliber cartridge was a laundry receipt, dated May 6, 2016, *i.e.*, three (3) days after Isaac's murder, indicating that defendant had dropped off a number of hooded sweatshirts to be dry cleaned. (Tr. 1543:1-22; GX 1425.) Under these circumstances, the jury could reasonably conclude that defendant possessed the ammunition located inside his apartment. Accordingly, the branches of defendant's Rule 29 Motion challenging the sufficiency of the evidence with respect to the felon-in-possession counts are denied in their entirety.

B.      Rule 33 Motion

1.      Standard of Review

Rule 33(a) of the Federal Rule of Criminal Procedure allows a district court to "vacate

any judgment and grant a new trial if the interest of justice so requires." "In evaluating a Rule 33

motion, the court must examine the entire case, take into account all facts and circumstances, and

make an objective evaluation, keeping in mind that the ultimate test for such a motion is whether

letting a guilty verdict stand would be a manifest injustice." *United States v. Alston*, 899 F.3d

135, 146 (2d Cir. 2018), *cert. denied*, 139 S. Ct. 1282, 203 L. Ed. 2d 292 (2019); *see also United

States v. Walker*, 974 F.3d 193, 208 (2d Cir. 2020) ("In determining whether to grant a Rule 33

motion, the ultimate test is whether letting a guilty verdict stand would be a manifest injustice.");

*United States v. Aguiar*, 737 F.3d 251, 264 (2d Cir. 2013) ("In deciding a Rule 33 motion, the

court must examine the entire case, take into account all facts and circumstances, and make an

objective evaluation. . . . The ultimate test [] is whether letting a guilty verdict stand would be a

manifest injustice.") "A court must have a real concern that an innocent person may have been

convicted in light of the evidence presented and the credibility of the witnesses." *Walker*, 974

F.3d at 208; *accord United States v. Escalera*, 957 F.3d 122, 137 (2d Cir. 2020), *cert. denied*,

141 S. Ct. 399 (2020).

A district court has "notably broad leeway" in ruling on a Rule 33 motion for a new trial.

*Walker*, 974 F.3d at 208; *see also Escalera*, 957 F.3d at 137 ("Rule 33 motions are granted only

in extraordinary circumstances, and are committed to the trial court's discretion."); *United States

v. DiTomasso*, 932 F.3d 58, 69 (2d Cir. 2019), *cert. denied*, 141 S. Ct. 314 (2020) ("The

discretion so conferred should be used sparingly, and only in the most extraordinary

circumstances; the ultimate test on such a motion is whether letting a guilty verdict stand would

28

be a manifest injustice.") "A district court abuses its discretion in denying a Rule 33 motion when (1) its decision rests on an error of law [] or a clearly erroneous factual finding, or (2) its decision—though not necessarily the product of a legal error or a clearly erroneous factual finding—cannot be located within the range of permissible decisions." *United States v. Vinas*, 910 F.3d 52, 58 (2d Cir. 2018).

### 2.   Denial of Associate Trial Counsel

Defendant contends that the Court's decision to limit funds under the Criminal Justice Act ("CJA"), 18 U.S.C. § 3006A, for a second trial attorney, associate counsel Jason Bassett, Esq, denied him due process and the constitutional right to effective assistance of counsel. Specifically, defendant contends: (a) that he was assigned new counsel, Gary Schoer, Esq., six and one-half (6 ½) months before he was to stand trial on a thirty-two (32)-count indictment relating to nine (9) separate incidents over a ten (10)-month period of time; (b) that since Schoer "confronted a mountain of information to digest and master in a limited period of time," Judge Spatt granted his request for associate counsel "to assist in preparing the defense," Affirmation of Murray E. Singer, Esq., in Support of Defendant's Rule 33 motion ("Singer Rule 33 Aff."), ¶ 19; (c) that in granting Schoer's request, Judge Spatt did not place any limitation on the number of hours associate counsel could work on this matter; (d) that "[f]or more than four and one-half months, counsel relied on associate counsel and prepared for trial with the understanding that associate counsel would be with him throughout the trial," *Id.*; (e) that after this case was reassigned to the undersigned, and less than two (2) months before trial, "the Court cut associate counsel to only 100 hours of work, needlessly forcing counsel to adjust to the fact that he would have to try this massive trial on his own," *Id.*; and (f) that the Court's decision "to limit the

29

assistance of associate counsel denied defendant the fundamental fairness due to him, and

deprived him of the effective assistance of trial counsel. *Id.* According to defendant, "[g]iven the

recognized complexity of the case, the late notice to Mr. Schoer that the assistance he had relied

on was being cut off significantly compromised Mr. Schoer's time and ability to prepare and

fully conduct the defense to these charges[;] [a]nd the Court's generic reasons for denying Mr.

Schoer the assistance he had relied on were insufficient to justify the denial." *Id.*, ¶ 22.

While "CJA matters rarely generate published decisions," at least one (1) circuit has held

that an abuse of discretion standard applies to a district court's decision to deny appointment of

additional counsel under the CJA[23]. *United States v. Clark*, 717 F.3d 790, 810-11 (10th Cir.

2013). This is consistent with the general principle that "[t]he decision to grant or deny funding

under [the CJA] is committed to the discretion of the district court." *United States v. Bah*, 574

F.3d 106, 118-19 (2d Cir. 2009); *see also United States v. Djibo*, 730 F. App'x 52, 57 (2d Cir.

Apr. 17, 2018) (summary order) (holding that the decision to deny CJA funding is reviewed for

abuse of discretion).

As the Second Circuit has held, a district court judge is "obligated to exercise [her]

discretion" in determining whether funds are necessary under the CJA. *United States v. Salameh*,

152 F.3d 88, 118 (2d Cir. 1998); *see also United States v. Oliver*, 626 F.2d 254, 260 (2d Cir.

1980) (observing that, while a district judge should entertain CJA funding requests with a

"liberal attitude," she is nevertheless "obligated to exercise [] discretion in determining whether

such services are necessary"). Thus, to obtain CJA funding, a defendant "must do more than

---

[23] This Court agrees with the Tenth Circuit's analysis finding that the abuse-of-discretion standard is appropriate because "[w]here the court is tasked with evaluating the prejudice that would befall a defendant absent additional counsel, it must consider a vast array of contextually specific matters related to the way the proceedings have advanced. Consequently, there will not necessarily be a single right answer, but a range of possible outcomes the facts and law at issue can fairly support." *Clark*, 717 F.3d at 811.

allege that [the requested] services would be helpful;" rather, he "must convince the court that the requested services are necessary to an adequate defense." *Clark*, 717 F.3d at 811; *see also Djibo*, 730 F. App'x at 57 ("A defendant seeking CJA resources has the burden of satisfying the district court that the services are reasonably necessary, and he must articulate a reasonable basis for the requested services."); *United States v. Sanchez*, 912 F.2d 18, 22 (2d Cir. 1990) ("[A] defendant requesting public funds pursuant to § 3006A(e) has the burden of satisfying the district court that the services are reasonably necessary, [and] he must articulate a reasonable basis for the requested services.") Defendant made no such showing either at trial or in his post-conviction motion.

Schoer was the seventh (7th) individual lawyer appointed to represent defendant in this matter. Each of the prior attorneys were competent and objectively well-qualified, and vigorously represented defendant during more than three (3) years of pretrial litigation[24]. Specifically, upon his arrest on October 9, 2016, experienced defense attorneys Michael D. Weil, Esq. and LaKeytria W. Felder, Esq., of the Federal Defenders of New York, Inc., were appointed, and they engaged in extensive motion practice, filing at least six (6) motions on defendant's behalf, including a motion to dismiss and three (3) motions to suppress. Nonetheless, on or about May 31, 2017, at defendant's behest, the Court discharged the Federal Defenders and appointed Kevin J. Keating, Esq., pursuant to the CJA.

---

[24] According to defendant, his "contention that he was denied fundamental fairness and the effective assistance of trial counsel has nothing to do with the work done by prior counsel - it has only to do with the circumstances under which Mr. Schoer was required to try this case." Reply Affirmation of Murray E. Singer, Esq. in Further Support of Defendant's Rule 33 motion ("Singer Rule 33 Reply"), ¶ 3. Defendant maintains that Schoer "had to review the mountains of discovery . . . [and] the extensive work done by prior counsel, . . . had to get up to speed on nine separate incidents, including a murder, in six to seven months [*sic*] time, . . . had to integrate a substantial amount of 3500 material in the last week or two before commencement of trial[,] . . . [a]nd then . . . had to prepare for over 70 witnesses, with the last minute pressure of having to do it all alone." *Id.* Thus, according to defendant, "[t]he number of prior counsel and the work performed by them is irrelevant to the issue presented." *Id.*

Keating filed another motion to suppress and represented defendant in a subsequent suppression hearing. Nevertheless, on or about March 9, 2018, again at defendant's insistence, the Court relieved Keating and appointed Robert P. LaRusso, Esq., a longtime member of the CJA panel and former Eastern District prosecutor, to represent defendant.

LaRusso, *inter alia*, filed a third motion to suppress and moved to reopen the previously held suppression hearing. LaRusso also requested, and Judge Spatt granted, the following requests for CJA funding to aid in trial preparation: (1) fifteen thousand dollars ($15,000.00) for a private investigator; (2) seven thousand five hundred dollars ($7,500.00) for a DNA forensic expert; (3) seven thousand five hundred dollars ($7,500.00) for a cellular forensic expert; and (4) seven thousand five hundred dollars ($7,500.00) for a ballistics expert. In addition, the Court authorized the assistance of former Suffolk County Legal Aid attorney James McCarthy, Esq.

Approximately three (3) weeks prior to the scheduled trial date, defendant refused, as was his right, to waive a potential conflict of interest on the part of LaRusso, so LaRusso was replaced by John S. Wallenstein, Esq. and trial was adjourned to October 2019. However, both McCarthy and the previously assigned investigator remained on the case, assuring continuity of counsel and a working knowledge of the facts. Nonetheless, on June 21, 2019, McCarthy and Wallenstein were also dismissed, again upon defendant's request[25].

Schoer was then assigned to the case and the trial was adjourned to January 13, 2020. Like defendant's prior counsel, Schoer also filed motions for relief on defendant's behalf, including a motion to dismiss; and he obtained authorization for seven thousand five hundred

---

[25] Wallenstein specifically indicated that he wished for McCarthy to remain on the defense team and that McCarthy was "a good lawyer," but when Judge Spatt asked defendant whether he would continue to accept McCarthy's services, defendant responded, "No." (June 21, 2019  Tr. at 17.) As a result, McCarthy was discharged.

dollars ($7,500.00) in CJA funds for the continued use of the private investigator employed by LaRusso, McCarthy and Wallenstein.

On July 1, 2019, *i.e.*, six (6) months prior to the start of trial, Schoer obtained CJA authorization to retain the help of Bassett, who became the eighth (8th) lawyer to aid in defendant's defense. Between July 1, 2019 and November 19, 2019, Schoer had unlimited use of Basset's assistance in preparing for trial. On November 19, 2019, approximately two (2) months before trial, the Court inquired of Schoer whether Basset's continued assistance was required. After Schoer and the government advised the Court of the volume of discovery in the case, the Court authorized an additional one hundred (100) hours for Bassett, but no more[26]. Schoer neither requested additional funds for Bassett nor indicated that the Court's ruling would prevent him from effectively and adequately representing his client[27]. (*See* Nov. 19, 2019 Tr. at 2:15-3:19 and 5:3-5.)

Trial commenced with jury selection on January 6, 2020. On January 7, 2020, the Court reiterated that funding for Bassett would not exceed the previously approved one hundred (100) hours, noting that CJA funds were only allocated for Bassett to aid Schoer in "getting ready" for trial and that Schoer would have the continued benefit of the private investigator. (*See* Tr. at 2:2-3:3.) Indeed, in the seven (7) weeks that elapsed since the November 19, 2019 conference, Bassett had not exhausted the one hundred (100) hours of authorized time; Bassett had spent an average of approximately fourteen (14) hours per week assisting Schoer. Again, Schoer did not

---

[26] Neither the CJA nor the Constitution confers upon a criminal defendant the right to representation by two (2) attorneys. The model CJA plan only provides for the appointment of more than one (1) attorney in cases determined by the court to be "extremely difficult." Guide to Judiciary Policy, Vol. 7 Pt. A. Ch. 2, Appx. 2A, V1. D.2.

[27] Defendant contends (i) that "[t]he model CJA plan allows for additional counsel, and the circumstances under which Mr. Schoer had to get up to speed and ready for trial cried out for the assistance of additional counsel;" and (ii) that the fact that Schoer "did not jump up and down and stamp his feet more vigorously in the face of the trial court's sua sponte determination that use of associate counsel would be limited can hardly be said to undermine defendant's claim." Singer Rule 33 Reply, ¶ 4.

object or allege that the discontinuance of Bassett's assistance after one hundred (100) hours would result in constitutionally ineffective representation. Rather, Schoer noted only that the government was represented by multiple attorneys, as had been true throughout the case, and stated simply that he "could use the help." (*Id.* at 2:16-18.)

Defendant's contention that, without Bassett, his trial team was so lacking in legal talent as to be constitutionally deficient, is without merit and belied by the record. Collectively, defendant was aided in his case by the appointment of eight (8) attorneys who aptly represented him over the course of more than three (3) years. Moreover, the Court approved the expenditure of more than forty-five thousand dollars ($45,000.00) in CJA funds so the defense could further its case through consultation with various experts and a private investigator, who was available to aid LaRusso, McCarthy, Wallenstein and Schoer. Accordingly, the Court's decision to deny additional funding for associate counsel based solely on Schoer's stray remark that he "could use the help" did not amount to a constitutional violation or "significantly compromise[]" trial preparation. Singer Rule 33 Aff. ¶ 22. Indeed, nearly two (2) months before trial Schoer was alerted that Bassett would not continue as associate counsel beyond the additional one hundred (100) hours authorized by the Court, and those additional hours afforded Schoer the benefit of Bassett's assistance through at least January 9, 2020, including at jury selection (in which Bassett participated) and the start of the trial.

Finally, defendant proffers no basis to conclude that Bassett's continued assistance was necessary to afford him due process or the effective assistance of counsel. Defendant, *inter alia*, has not identified any relevant experience, specialized capability or other advantage that he was denied as a result of Bassett's absence. In fact, Bassett is not admitted to the CJA panel and was seeking to obtain federal experience through assistance with this case. On the other hand,

34

throughout the course of this case, defendant rejected the assistance of at least six (6) other attorneys with far more experience than Bassett in federal practice, including the aid of McCarthy as associate counsel.

Defendant also fails to identify any problems or shortcomings with Schoer's representation that would have been avoided or substantially remedied by the continued assistance of Bassett. The record shows that Schoer is a highly experienced criminal defense attorney, *i.e.*, he is a member of the bar since 1976, an established federal criminal practitioner and longtime member of the Eastern District's CJA panel, who ably represented defendant. Accordingly, there is no non-speculative basis to conclude that Basset's presence would have altered the outcome of the trial in any meaningful way. In light of Schoer's criminal defense experience and his conduct in this case, as well as the fact that he was granted the assistance of associate counsel for a limited period of time, Schoer's representation was sufficient for an adequate defense. In other words, defendant has not established that the continued services of Bassett was necessary to an adequate defense. Accordingly, the branch of defendant's Rule 33 Motion seeking a new trial on the basis that he was denied due process and the effective assistance of counsel by the Court's decision to deny further CJA funds for the continued assistance of associate counsel is denied in its entirety.

### 3.    Evidentiary Ruling During the Cross-Examination of Winters

Defendant's contentions that he was denied due process, the right to present a defense, the right to confront his accusers and the effective assistance of counsel when the Court limited the scope of cross-examination of Winters, *see* Singer Rule 33 Aff. ¶ 23, are without merit.

a.    Trial Courts Have Broad Discretion to Manage the Scope of Cross
-Examination

"The right of an accused in a criminal trial to due process is, in essence, the right to a fair

opportunity to defend against the State's accusations. The rights to confront and cross-examine

witnesses and to call witnesses in one's own behalf have long been recognized as essential to due

process." *Chambers v. Mississippi*, 410 U.S. 284, 294, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973).

"The main and essential purpose of confrontation is to secure for the opponent the opportunity of

cross-examination." *Delaware v. Fensterer*, 474 U.S. 15, 19-20, 106 S. Ct. 292, 88 L.Ed.2d 15

(1985); *see also Alvarez v. Ercole*, 763 F.3d 223, 229-30 (2d Cir. 2014) ("Supreme Court law

clearly establishes that, under the Sixth Amendment's Confrontation Clause, a criminal

defendant must have a meaningful opportunity to cross-examine witnesses against him."); *Corby

v. Artus*, 699 F.3d 159, 166 (2d Cir. 2012) (holding that the Confrontation Clause "affords a

defendant a meaningful opportunity to cross-examine witnesses against him in order to show

bias or improper motive for their testimony.") "[A] criminal defendant states a violation of the

Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate

cross-examination designed to show a prototypical form of bias on the part of the witness, and

thereby to expose to the jury the facts from which jurors [] could appropriately draw inferences

relating to the reliability of the witness." *Delaware v. Van Arsdall*, 475 U.S. 673, 680, 106 S. Ct.

1431, 89 L. Ed. 2d 674 (1986).

However, "the Confrontation Clause guarantees an *opportunity* for effective cross-

examination, not cross-examination that is effective in whatever way, and to whatever extent, the

defense might wish." *Fensterer*, 474 U.S. at 20, 106 S. Ct. 292 (emphasis in original); *see also

Alvarez*, 763 F.3d at 230 ("The Confrontation Clause does not . . . guarantee unfettered cross

examination.") "The trial court has broad discretion [] to impose reasonable limits on [] cross

36

examination based on concerns about [] harassment, prejudice, confusion of the issues, [] or interrogation that is repetitive or only marginally relevant." *Alvarez*, 763 F.3d at 230; *see also United States v. James*, 712 F.3d 79, 103 (2d Cir. 2013) ("A district court is accorded broad discretion in controlling the scope and extent of cross-examination. . . . Therefore, a district court may impose reasonable limits on cross-examination to protect against, e.g., harassment, prejudice, confusion, and waste.") *Corby*, 699 F.3d at 166 ("A trial judge retains wide latitude to restrict cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant."); *Watson v. Greene*, 640 F.3d 501, 510 (2d Cir. 2011) ("The right to cross-examination . . . is not unlimited. . . . The extent of cross-examination rests in the sound discretion of the trial judge.") "In the exercise of discretion, a district court should consider the need to ascertain the truth, avoid needless consumption of time, and protect witnesses from harassment or undue embarrassment." *James*, 712 F.3d at 103; *see also Corby*, 699 F.3d at 166 ("To determine the propriety of cross-examination, as with other determinations of admissibility of evidence, courts balance prejudice versus probative value.") "A trial judge abuses his discretion in curtailing cross-examination of a government witness when the curtailment denies the jury sufficient information to make a discriminating appraisal of the particular witness's possible motives for testifying falsely in favor of the government." *United States v. White*, 692 F.3d 235, 248 (2d Cir. 2012).

> ### b.   Limiting Cross-Examination of Winters

According to defendant, defense counsel sought to impeach the testimony of Winters "by highlighting the benefit Mr. Winters hoped to achieve by offering his testimony," and focusing

on Winters's "understanding and belief about obtaining a 5K1letter from the government and the hoped-for benefit that would ensue." Schoer Rule 33 Aff., ¶ 24. Defendant challenges the Court's decisions to "cut off counsel's line of questioning, denigrate[] defense counsel, and instruct[] the jury to disregard counsel's questions," as well as to instruct the jury the following morning "that defense counsel 'suggested' an erroneous interpretation on the law governing sentencing." *Id.*

The Court's ruling limiting the cross-examination of Winters regarding his understanding about how he might obtain a 5K1.1 letter ("5K letter") was precipitated by Schoer asking Winters if the government determines whether he gets a 5K letter.[28] (Tr. 180:2-4 and 179: 20-22.) Winters responded with his understanding that he would get such a letter if he "cooperate[s] and tell[s] the truth." (Tr. 180:5.) When Schoer implied that that the government was the only party with the power to determine whether Winters was entitled to a 5K letter, (*see* Tr. 180:6-7), Winters clarified his understanding: "them, and the evidence. If the evidence states that I tell the truth." (Tr. 180:8-9.) Schoer persisted: "It's the office. If the office determines that the defendant has cooperated fully. . . the office will file a 5K1 letter. . . [s]o the only party that determines whether you're telling the truth here are the people sitting at [the government's] table." (Tr. 180:10-18.)

However, at the ensuing sidebar, Schoer agreed that it was not, in fact, solely up to the government to determine whether Winters is entitled to a 5K letter, noting that the Court retains discretion regarding the issuance of such a letter if it "determine[s] that the Government has not

---

[28] Defendant contends that defense counsel's questioning about Winters's "understanding of how the sentencing process worked and how he might receive his hoped-for benefit . . . had solely to do with the witness's motives and expectations, not whether he was correct." Singer Rule 33 Reply, ¶ 5. According to defendant, "[t]he prosecution confused the issue by claiming a misstatement of the law, which in turn led to the Court striking questions that had been asked, limiting further questioning, and giving the jury instructions on a point different from that put forth by defense counsel." *Id.*

acted in good faith" and "enforces [the cooperation] agreement." (Tr. 181:20-21 and 181:25.) The Court then instructed the jury, *inter alia*, that sentencing "involve[s] many different factors and issues that a judge takes into consideration," and instructed them to disregard the portion of the inquiry dealing with the 5K letter. (Tr. 183:2-12.) Schoer did not claim any legal error in that charge, but rather objected to the ruling on the basis that the jury might believe that they were precluded from considering "the fact that [Winters] has a cooperation agreement." (Tr. 184:4-6.) However, the Court reiterated that Schoer could ask about "the fact that [the government] can make a recommendation based upon [Winters's] cooperation" and confirmed that the jury "can take into account the cooperation agreement." (Tr. 185:16-18 and 186:8-9.) Schoer then asked questions that adequately established Winters's hope of obtaining a benefit from the government through his testimony:

> Q:  Your goal in negotiations with the government and in signing the cooperation was to get a benefit; isn't that so?
>
> [ . . . ]
>
> Q:  And the benefit would be a lesser sentence, correct?
>
> A:  Correct.
>
> Q:  And that's your goal as you sit here today, correct?
>
> A:  Correct.

(Tr. 187:5-17.)

The following day, the Court instructed the jury as follows:

> "During cross-examination yesterday it was suggested that a judge may only sentence a defendant below the statutory minimum sentence if the government provided what was called a 5K letter which you heard about yesterday regarding cooperation. That is not the law. A judge has discretion to sentence a defendant below the statutory minimum sentence over the government's objection if the Court finds that the government has acted in bad faith. In assessing witness credibility

39

> which is your job, you may consider that a witness hopes to receive a benefit at
> sentencing, but the Court, not the government, is the ultimate sentencing authority."

(Tr. 203:11-22.) Schoer objected to giving the charge, but did not allege any legal defect in the

curative charge itself. (Tr. 200:13-20.) In fact, Schoer essentially agreed the charge was legally

correct by arguing that "if the judge finds that the government is acting in bad faith and not under

a cooperation agreement . . . a judge could go below the mandatory minimum if the government

didn't file a 5K1 letter." (Tr. 197:15-19 and 198:8-11.)

Since defense counsel's questions regarding 5K letters mischaracterized the law and

risked creating confusion over the nuances of sentencing, limiting cross-examination on this

narrow issue was a sound exercise of the Court's discretion. *See, e.g. United States v. Gonzalez,*

399 F. App'x 641, 647 (2d Cir. Nov. 3, 2010) (summary order) (finding that the district court

"acted well within its discretion" to exclude questions seeking "to elicit a legal conclusion over a

complicated statutory scheme" because such "lines of questioning were confusing, repetitive,

and only marginally relevant.") Accordingly, defendant has not established that this ruling

constituted a constitutional violation.

c.    Winters's Credibility

Defendant's contention that the Court's ruling interfered with his ability to "highlight[ ]

the benefit Mr. Winters hoped to achieve by offering his testimony," Singer Rule 33 Aff. ¶ 24, is

also without merit. "Cross-examination is not improperly curtailed if the jury is in possession of

facts sufficient to make a discriminating appraisal of the particular witness's credibility." *United*

*States v. Roldan-Zapata*, 916 F.2d 795, 806 (2d Cir. 1990); *accord United States v. Lebedev*, 932

F.3d 40, 52 (2d Cir. 2019), *cert. denied*, 140 S. Ct. 1224, 206 L. Ed. 2d 219 (2020). The Court,

*inter alia*, permitted cross-examination of Winters's: (1) criminal history and recurring drug use

40

(Tr. 145:20-150:25, 155:9-158:1, 164:13-165:10); (2) prior inconsistent statements to law enforcement (Tr. 143:1-145:19); (3) history of lying to judges, probation officers and even former girlfriends (Tr. 165:11-166:25); and (4) hope of obtaining a benefit from the government (*see* Tr. 151:1-155:8, 159:3-160:7, 187:5-17).

Moreover, throughout trial, the prosecution, defense and Court repeatedly cautioned the jury that cooperating witnesses like Winters might be incentivized to lie in the hope of obtaining a lesser sentence. In opening statements, the government noted that cooperators were "hoping for leniency," (Tr. 22:11-19), and Schoer warned that such witnesses were seeking to avoid longer sentences and hoping "through their testimony, to benefit themselves." (Tr. 28:13-23.) On direct examination, Winters acknowledged that he pleaded guilty pursuant to a cooperation agreement and was hoping for leniency at sentencing, (Tr. 72:15-73:24); and on cross-examination, he acknowledged that his goal in cooperating was to get a benefit, specifically a lesser sentence. (Tr. 187:5-17.) In closing arguments, Schoer reiterated that cooperating witnesses "hope to receive a benefit" and encouraged the jury to look at cooperation agreements that, with the government's consent, were admitted into evidence. (Tr. 2464:9-21; 2463:12-25.) Finally, prior to deliberations, the Court instructed the jury that "a witness has a motive to testify falsely" if he realizes "he may be able to obtain his own freedom, or receive a lighter sentence by giving testimony favorable to the Government." (Tr.2557:24-2558:7.) Thus, reviewing the record as a whole, it is clear that the jury had sufficient information to properly weigh the testimony of government cooperators, including Winters. Indeed, the jury acquitted defendant of charges associated with two (2) robberies that were based exclusively on cooperator testimony.

The Court's ruling did not prohibit Schoer from noting that Winters, or any other cooperator, hoped to obtain a benefit at sentencing in exchange for his testimony. To the

contrary, Schoer was permitted to ask questions highlighting that hope and the Court explicitly told the jury that they could, and should, consider such motivation. Accordingly, the branch of defendant's Rule 33 Motion seeking a new trial on the basis that he was denied due process, the right to present a defense, the right to confront his accusers and the effective assistance of counsel by the Court's evidentiary ruling during the cross-examination of Winters is denied in its entirety.

4.      Time Restrictions on Closing Arguments

Defendant's unsupported contention that the Court's imposition of a time limitation on closing arguments deprived him of the effective assistance of counsel and the right to mount a defense, Singer Rule 33 Aff. ¶ 27, is without merit.

Trial judges have "broad discretion" and are given "great latitude in controlling the duration and limiting the scope of closing summations," *i.e.*, they may "limit counsel to a reasonable time[,] . . . terminate argument when continuation would be repetitive or redundant[,] . . . [and] ensure that argument does not stray unduly from the mark, or otherwise impede the fair and orderly conduct of the trial." *Herring v. New York*, 422 U.S. 853, 862, 95 S. Ct. 2550, 45 L. Ed. 2d 593 (1975); *accord United States v. Ngono*, 801 F. App'x 19, 21 (2d Cir. Feb. 3, 2020) (summary order). Defendant and the government were each allotted an equal one hour and twenty minutes to deliver a closing argument, which was unquestionably fair. *See, e.g. United States v. Salazar*, 485 F.2d 1272, 1279 (2d Cir. 1973) ("[T]he judge was entirely within his discretion in limiting appellant's summation to forty-five minutes, the same time allotted the government.")

42

Defendant contends that the Court abused its discretion because seventy-three (73) witnesses testified over thirteen (13) court days over four (4) weeks and his counsel's summation "was his last opportunity to address all of this testimony (and the exhibits), and had to cover nine separate incidents on nine separate dates, including one Firearm-Related Murder, plus four counts of possession of a weapon on four additional dates." Singer Rule 33 Aff., ¶ 28. According to defendant, limiting defense counsel's argument to one hour and twenty minutes, given the number of incidents and the complexities of this case, was "simply not reasonable" and constituted an abuse of discretion. *Id.*; Singer Rule 33 Reply, ¶ 6.

Defendant further questions whether Schoer had prior knowledge of the time limitation, *see* Singer Aff. ¶ 29, and, indeed, Schoer expressed apparent confusion over the total time allotted for closing arguments immediately prior to closing. (Tr. 2442:6-10.) However, Schoer did not object when both the government and the Court correctly noted that the time limitations had been definitively set before trial commenced. (Tr. 2481: 18-2482:6.) In any event, it is undisputed that, before beginning his summation, Schoer was advised, outside the presence of the jury, that he had one hour and twenty minutes to close, (Tr. 2442:4-5); and he did not object, ask for additional time or raise any alleged constitutional deprivation with respect to the time limitation. (Tr. 2442:2-17.)

Moreover, following the government's summation, which concluded within the allotted time, the Court took a recess. Therefore, even to the extent Schoer had prepared a slightly longer summation (Schoer indicated he could sum up in approximately 90 minutes (Tr. 2442:1-2)), he had ample opportunity to adjust his remarks as needed. (Tr. 2443:1-12.) Furthermore, when Schoer claimed, after beginning his closing argument, that he needed additional time, the Court

granted him a few additional minutes to conclude. (Tr. 2476:21-2477:14.) Although he initially

protested, Schoer concluded within that additional time. (Tr. 2481:18-25.)

The record does not establish that Schoer required more time during summations to

effectively represent his client. Nor does defendant identify any area of the case, much less a

crucial aspect of it, that Schoer might have addressed with more additional time. To the contrary,

Schoer's closing remarks challenged nearly every aspect of the government's case: he questioned

the credibility of law enforcement witnesses and the validity of the evidence they recovered (Tr.

2457-62), cast doubt on the qualifications of the government's expert witnesses and attacked the

reliability of the government's cell site and ballistics evidence (Tr. 2452-55), highlighted the lack

of forensic evidence and affirmative victim identifications (Tr. 2459-60, 2472-73), and

emphasized the incentive that cooperating witnesses might have for lying (Tr. 2462-72). The

scope of Schoer's summation touched on each of the crimes charged, and defendant does not

contend otherwise. Given the breadth of Schoer's summation, and the fact that he successfully

obtained an acquittal on six (6) counts of the indictment, there is no basis to conclude that any

time limitation on closing arguments denied defendant the effective assistance of counsel.

Accordingly, the branch of defendant's Rule 33 Motion seeking a new trial on the basis that he

was denied the effective assistance of counsel and the right to mount a defense by the Court's

decision to limit the duration of closing summations is denied in its entirety.


5.    Defendant Received Constitutionally Effective Counsel At Trial

Defendant claims that his trial counsel was ineffective for failing to obtain "independent

extractions" of certain cellphones and to pursue a further analysis of the IP addresses contained

44

in Google records related to his email address[29]. *See* Singer Rule 33 Aff. ¶¶ 37-42. Although defendant theorizes that such analyses might have developed favorable evidence, he fails to offer any non-speculative basis to conclude that further digital analysis was likely to alter the outcome of the trial. Accordingly, defendant's constitutional ineffective assistance of trial counsel claims fail.

a.     Defendant's Burden

A defendant advancing an ineffective assistance of counsel claim bears a heavy burden of showing "that (1) counsel's performance was objectively deficient, and (2) [defendant] was actually prejudiced as a result." *Harrington v. U.S.*, 689 F.3d 124, 129 (2d Cir. 2012) (citing *Strickland v. Washington*, 466 U.S. 668, 687-88, 692-93, 104 S. Ct. 2052, 80 L.Ed.2d 674 (1984)); *see also United States v. White*, 174 F.3d 290, 294 (2d Cir. 1999) ("Under the familiar standard articulated in *Strickland* . . . a defendant who seeks to establish a claim of ineffective assistance of counsel must affirmatively demonstrate both that counsel's performance fell below an objective standard of reasonableness and that he suffered prejudice, in the sense that there is a

---

[29] Specifically, defendant contends that "[i]n the months leading up to the trial," he raised several claims to defense counsel concerning: (i) "the truthfulness and accuracy of police testimony at the pretrial hearings concerning a) when and where the 'roof' phone was recovered, and whether it was accessed and/or used during relevant time periods on the date it was recovered, b) when and where the 'van' phone was recovered, whether it was accessed and/or used during relevant time periods on the date if [*sic*] was recovered, and whether items were deleted from the phone, and c) whether and when the 'parole' phone was accessed used [*sic*] following defendant being taken into custody on June 10, 2016," Singer Rule 33 Aff., ¶ 34; and (ii) "when, where and how the 'parole' phone was handled following it's [*sic*] seizure on June 10, 2016." *Id.*, ¶ 39. According to defendant, a purported "cell phone expert" with whom defense counsel consulted: (i) advised defense counsel "that he would have to perform his own extraction from the cell phones at issue using different and, in his view, better software than had been used by the government[,]" but defense counsel "did not seek the Court's assistance in making the cell phones available to the expert, nor did he otherwise pursue further extractions from the cell phones at issue," *Id.*, ¶ 34; and (ii) indicated that the IP address information contained in Government's exhibit 22b "could be examined to try to determine the location of the phone following its seizure on June 10, 2016," but defense counsel "did not thereafter pursue examination of the IP addresses contained in Government's exhibit 22b." *Id.*, ¶ 39. Defendant contends that the additional extractions and analysis sought by defendant, but not pursued by counsel, "could have" established that much of the police testimony as to when and where the cell phones were recovered, and what was done with the phones once they were recovered, "was not truthful and/or accurate, and would have substantially affected the credibility determinations made by the hearing court in denying suppression." *Id.*, ¶¶ 35, 40.

reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.") "[A]t the first step of analysis, [the Court] must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance, . . . viewing the actions in light of the law and circumstances confronting counsel at the time." *Harrington*, 689 F.3d at 129. "The determinative question at this step is not whether counsel deviated from best practices or most common custom, but whether his representation amounted to incompetence under prevailing professional norms." *Id.* at 129-30. "At the second step of analysis, a petitioner cannot show prejudice if the claim or objection that an attorney failed to pursue lacks merit." *Id.* at 130.

"When considering the first prong, [courts] strongly presume that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment, . . a presumption that is overcome only through a showing that counsel failed to act reasonably considering all of the circumstances." *Jackson v. Conway*, 763 F.3d 115, 152 (2d Cir. 2014); *see also Burt v. Titlow*, 571 U.S. 12, 22-23, 134 S. Ct. 10, 187 L. Ed. 2d 348 (2013) ("[C]ounsel should be strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment, . . . [and] the burden to show that counsel's performance was deficient rests squarely on the defendant."); *United States v. Yingst*, 623 F. App'x 17, 21 (2d Cir. Aug. 26, 2015) (summary order) ("[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.") Accordingly, "[t]he standard for evaluating the adequacy of counsel's representation is 'a most deferential one.'" *Yingst*, 623 F. App'x at 21 (quoting *Harrington v. Richter*, 562 U.S. 86, 105, 131 S. Ct. 770, 178 L.Ed.2d 624 (2011)).

To show the requisite prejudice at the second step, the defendant "must demonstrate a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Richter*, 562 U.S. at 104, 131 S. Ct. 770. "It is not enough to show that the errors had some conceivable effect on the outcome of the proceeding. . . . Counsel's errors must be so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.*; *see also Garner v. Lee*, 908 F.3d 845, 849 (2d Cir. 2018), *cert. denied*, 139 S. Ct. 1608, 203 L. Ed. 2d 761 (2019) ("To establish an ineffective assistance of counsel claim under *Strickland* . . . the likelihood of a different result in the absence of the alleged deficiencies in representation must be substantial, not just conceivable."); *Jackson*, 763 F.3d at 153 ("To establish prejudice under the second prong, [defendant] must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. . . . A 'reasonable probability' is one that is sufficient to undermine confidence in the outcome," . . . which requires a substantial, not just conceivable, likelihood of a different result.") Applying these standards, it is clear that defendant has no viable Sixth Amendment claim.

> b. Failure to Obtain Independent Examinations of Defendant's Cellphones or Further Analysis of IP Addresses Associated with Defendant's Email Address

Defendant has not established either that Schoer's alleged missteps were objectively unreasonable or that he would have avoided conviction absent Schoer's conduct. Rather, defendant merely speculates that independent extractions of his cellular devices and the IP addresses associated with his email address "could have" established untruthful or inaccurate

police testimony, Singer Rule 33 Aff., ¶ 35, which is insufficient to meet the requirements of *Strickland*.

Under *Strickland*, defendant's burden is to affirmatively demonstrate that there was, in fact, useful information, *i.e.*, information that would have resulted in a different verdict, contained on his cellphones that Schoer unreasonably failed to obtain. *See, e.g., Baran v. United States*, 160 F. Supp. 3d 591, 599 (S.D.N.Y. 2016) (rejecting the defendant's claim that she was denied the effective assistance of counsel due to defense counsel's failure to investigate because the defendant only speculated as to what defense counsel might have found upon such investigation and the effect such evidence might have had upon the verdict); *Donato v. United States*, No. 09-cv-5617, 2012 WL 4328368, at *6 (E.D.N.Y. Sept. 20, 2012) (holding that the defendant's speculation that additional exculpatory evidence was "possibly available" "satisfies neither *Strickland*'s deficient performance nor prejudice prongs."); *McPherson v. Greiner*, No. 02-CV-2726 (DLC), 2003 WL 22405449, at *25 (S.D.N.Y. Oct. 22, 2003) (holding that speculation about "what exculpatory evidence a proper investigation would have revealed, or how such evidence would have benefitted [the defendant's] case . . . satisfies neither *Strickland*'s deficient performance nor prejudice prongs.") "While failure to conduct adequate pre-trial investigation may serve as the basis for a claim of ineffective assistance of counsel under *Strickland*, . . . a [defendant] must do more than make vague, conclusory, or speculative claims as to what evidence could have been produced by further investigation." *Taylor v. Poole*, No. 07 Civ. 6318, 2009 WL 2634724, at *14 (S.D.N.Y. Aug. 27, 2009); *see also United States v. Vrancea*, No. 12-cr-198, 17-cv-5235, 2019 WL 6726829, at *6 (E.D.N.Y. Dec. 11, 2019) ("To succeed on a claim of ineffective assistance of counsel for failure to investigate . . . [the defendant] has the burden of providing the court sufficiently precise information, that is, a

comprehensive showing as to what the investigation would have produced. . . . Vague, conclusory, or speculative claims will not suffice.")

In an effort to make the required evidentiary showing, defendant offers an email in which a purported expert suggests that additional investigative steps might have been useful. However, the exchange shows that defendant's legal team was already in possession of material that it could use to challenge law enforcement's account regarding the recovery of the phones at issue. For example, the expert indicated that he had "mapped" call detail records regarding a potential plant of one of the defendant's phones (the so-called "roof phone"). *See* Def. Mot. Ex. A, pg. 1. Such information could also have been assessed from the government's production of cellular location site data associated with defendant's phone.

With respect to location information that might be revealed from IP addresses, the expert actually appeared to indicate that further analyses might not be useful, observing that "[a]ctivity is turned off in his Google [*sic*] account thus no cloud data for us to use. IP data from provider does not provide location data unless his phone automatically is set up to connect to known networks." *Id.* at 9. Although the expert indicated that, based upon available information, he could "establish actual phone activity" at times consistent with the defendant's theory of the case, *id.*, when Schoer asked him what, in particular, an independent extraction might reveal, the expert responded "3rd party application evidence related to someone accessing the phone data or apps during [] suspect times," and that he would use such evidence "just to compare" his output with the government's output. *Id.* at 6. In other words, according to defendant's own expert, an independent analysis might have produced information that, at best, could have been used to press an argument that defendant had unsuccessfully raised in multiple motions to suppress. (*See*

DE 110, 158, 185 and 281.) Accordingly, Schoer did not act unreasonably in declining to expend time and resources pursuing such an analysis.[30]

Even assuming, *arguendo*, that additional forensic analyses would have produced useful information, defendant has not articulated any non-speculative basis to conclude that, when juxtaposed with the overwhelming evidence of his guilt at trial, such information would have affected the jury's verdict. Indeed, even in the rare case where counsel's strategy is deemed "professionally unreasonable," there is no ineffective assistance claim "if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691, 104 S. Ct. 2052; *accord Griggs v. Lempke*, 797 F. App'x 612, 617-18 (2d Cir. Jan. 7, 2020) (summary order). "A verdict or conclusion with ample record support is less likely to have been affected by the errors of counsel than a verdict or conclusion only weakly supported by the record." *Garner*, 908 F.3d at 862. Since, the stronger the prosecution's case, the less likely it is that the defendant was prejudiced by his attorney's conduct, even serious errors by counsel do not warrant granting post-conviction relief where, as here, the conviction is supported by overwhelming evidence of guilt[31]. *See, e.g. Id.*; *Lindstadt v. Keane*, 239 F.3d 191, 204 (2d Cir. 2001). Accordingly, defendant's claims of ineffective assistance based upon defense counsel's purported failure to investigate are without merit.

---

[30] Defendant rhetorically questions, "What 'objectively reasonable' determination could have been made to not pursue evidence that the expert advised would be helpful and which would have strengthened his arguments?" given that "Schoer's trial strategy, pursued through cross-examination of the government's expert witnesses and in his summation, was to challenge the credibility of the police concerning when and where the various phones were recovered, . . . the expert's conclusions about where the phones were at different days and times[,] . . . [and] the police claim that the parole phone, following its seizure on June 10, 2016, had been held in a safe." Singer Rule 33 Reply, ¶ 7. According to defendant, "the purpose of pursuing extractions by his own expert was to fortify the arguments he intended to, and did, make at trial." *Id.*

[31] Defendant merely notes that he was acquitted of all charges related to two (2) incidents presented to the jury; and that, as argued in his Rule 29 Motion, "the evidence was not even legally sufficient, much less overwhelming, as to four of the remaining seven incidents and three of the four felon in possession counts." Singer Rule 33 Reply, ¶ 8. In addition, defendant conclusorily contends that "the jury's view of much of the expert evidence relied on by the government likely would have been much different had it been presented with evidence challenging the officers' accounts of the recovery, movement and use of the cell phones in question." *Id.*

Therefore, the branches of defendant's Rule 33 Motion seeking a new trial on the basis that he was denied the effective assistance of trial counsel are denied in their entirety.

6.      Defendant's *Pro Se* Supplemental Brief

By order dated November 2, 2020, the Court granted defendant's motion for leave to file a *pro se* supplemental brief in support of his Rule 33 Motion. In his supplemental brief, defendant principally contends, *inter alia*, that since the reassignment of this case to the undersigned, the Court has demonstrated bias and prejudice against him, and "an inability to remain fair and impartial compromising the integrity of [his] criminal proceedings," and, therefore, should recuse itself pursuant to 28 U.S.C. § 455. *See* DE [404-1]. Defendant's contentions are without merit.

A district court judge must recuse herself, *inter alia*, "in any proceeding in which [her] impartiality might reasonably be questioned," 28 U.S.C. § 455(a), or where she "has a personal bias or prejudice concerning a party." 28 U.S.C. § 455(b)(1). Under § 455(a), the moving party must demonstrate an "objectively reasonable basis for questioning a judge's impartiality." *United States v. Osinowo*, 100 F.3d 942, 1996 WL 20514, at *1 (2d Cir. Jan. 19, 1996) (unpublished opinion); *see also S.E.C. v. Razmilovic*, 738 F.3d 14, 29 (2d Cir. 2013) ("The standard for disqualification under 28 U.S.C. § 455(a) is an objective one; . . . the question is whether an objective and disinterested observer, knowing and understanding all of the facts and circumstances, could reasonably question the court's impartiality."); *In re I.B.M. Corp.*, 45 F.3d 641, 644 (2d Cir. 1995) ("[T]he test to be applied [under § 455(a)] is an objective one which assumes that a reasonable person knows and understands all the relevant facts.") "[T]he ultimate inquiry is whether circumstances satisfy section 455(a), *i.e.*, create an objectively reasonable

51

basis for questioning a judge's impartiality, by showing a deep-seated favoritism or antagonism that would make fair judgment impossible." *In re I.B.M. Corp.*, 45 F.3d at 644.

"Judicial rulings alone . . . almost never constitute valid basis for a bias or partiality motion" and "can only in the rarest circumstances evidence the degree of favoritism or antagonism required." *In re I.B.M. Corp.*, 45 F.3d at 644; *see also United States v. Conte*, 99 F.3d 60, 65 (2d Cir. 1996) ("Events occurring in the course of judicial proceedings generally do not constitute a basis for recusal unless they indicate that the judge has a deep-seated favoritism or antagonism that would make fair judgment impossible.") "[R]ecusal is not warranted where the only challenged conduct consists of judicial rulings, routine trial administration efforts, and ordinary admonishments [] to counsel and to witnesses, where the conduct occurs during judicial proceedings, and where the judge neither (1) relies upon knowledge acquired outside such proceedings nor (2) displays deep-seated and unequivocal antagonism that would render fair judgment impossible." *Razmilovic*, 738 F.3d 14, 29-30.

All of defendant's complaints about this Court center on judicial rulings, ordinary trial administration efforts, and relatively routine commentary on the positions and conduct of the parties in the litigation. Defendant points to no objective basis for attributing any of those judicial acts to bias, and the remarks that defendant cites as evidence that this Court was impermissibly biased do not indicate that this Court has a deep-seated favoritism or antagonism that would make fair judgment impossible. Accordingly, no objective and disinterested observer, knowing and understanding all of the facts and circumstances of this case, could reasonably question this Court's impartiality based upon the circumstances challenged by defendant in his *pro se* supplemental brief.

III.    Conclusion

For the reasons set forth above, defendant's motions for a judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure and for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure are denied in their entirety.


SO ORDERED.

_____/s/  *Sandra J. Feuerstein*_____

Sandra J. Feuerstein
United States District Judge

Dated:  January 6, 2021
          Central Islip, New York